## SHALALA, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* GUERNSEY MEMORIAL HOSPITAL

No. 93–1251.   Argued October 31, 1994—Decided March 6, 1995

88

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which SCALIA, SOUTER, and THOMAS, JJ., joined, *post*, p. 102.

*Kent L. Jones* argued the cause for petitioner. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Anthony J. Steinmeyer,* and *John P. Schnitker.*

*Scott W. Taebel* argued the cause for respondent. With him on the brief was *Diane M. Signoracci.**

JUSTICE KENNEDY delivered the opinion of the Court.

In this case a health care provider challenges a Medicare reimbursement determination by the Secretary of Health and Human Services. What begins as a rather conventional accounting problem raises significant questions respecting the interpretation of the Secretary's regulations and her authority to resolve certain reimbursement issues by adju-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Hospital Association et al. by *Robert A. Klein* and *Charles W. Bailey;* for the hospitals participating in *St. John Hospital* v. *Shalala* by *William G. Christopher, Chris Rossman,* and *Kenneth R. Marcus;* and for the Mother Frances Hospital et al. by *Dan M. Peterson.*

dication and interpretive rules, rather than by regulations that address all accounting questions in precise detail.

The particular dispute concerns whether the Medicare regulations require reimbursement according to generally accepted accounting principles (GAAP), and whether the reimbursement guideline the Secretary relied upon is invalid because she did not follow the notice-and-comment provisions of the Administrative Procedure Act (APA) in issuing it. We hold that the Secretary's regulations do not require reimbursement according to GAAP and that her guideline is a valid interpretive rule.

I

Respondent Guernsey Memorial Hospital (hereinafter Hospital) issued bonds in 1972 and 1982 to fund capital improvements. In 1985, the Hospital refinanced its bonded debt by issuing new bonds. Although the refinancing will result in an estimated $12 million saving in debt service costs, the transaction did result in an accounting loss, sometimes referred to as an advance refunding or defeasance loss, of $672,581. The Hospital determined that it was entitled to Medicare reimbursement for about $314,000 of the loss. The total allowable amount of the loss is not in issue, but its timing is. The Hospital contends it is entitled to full reimbursement in one year, the year of the refinancing; the Secretary contends the loss must be amortized over the life of the old bonds.

The Secretary's position is in accord with an informal Medicare reimbursement guideline. See U. S. Dept. of Health and Human Services, Medicare Provider Reimbursement Manual § 233 (Mar. 1993) (PRM). PRM § 233 does not purport to be a regulation and has not been adopted pursuant to the notice-and-comment procedures of the Administrative Procedure Act. The fiscal intermediary relied on § 233 and determined that the loss had to be amortized. The Provider Reimbursement Review Board disagreed, see App. to Pet. for Cert. 54a, but the Administrator of the Health Care

Financing Administration reversed the Board's decision, see *id.*, at 40a. In the District Court the Secretary's position was sustained, see *Guernsey Memorial Hospital* v. *Sullivan,* 796 F. Supp. 283 (SD Ohio 1992), but the Court of Appeals reversed, see *Guernsey Memorial Hospital* v. *Secretary of Health and Human Services,* 996 F. 2d 830 (CA6 1993). In agreement with the Hospital, the court interpreted the Secretary's own regulations to contain a "flat statement that generally accepted accounting principles 'are followed'" in determining Medicare reimbursements. *Id.,* at 833 (quoting 42 CFR § 413.20(a)). Although it was willing to accept the argument that PRM § 233's treatment of advance refunding losses "squares with economic reality," 996 F. 2d, at 834, the Court of Appeals concluded that, because PRM § 233 departed from GAAP, it "effects a substantive change in the regulations [and is] void by reason of the agency's failure to comply with the Administrative Procedure Act in adopting it." *Id.,* at 832. Once the court ruled that GAAP controlled the timing of the accrual, it followed that the Hospital, not the Secretary, was correct and that the entire loss should be recognized in the year of refinancing.

We granted certiorari, 511 U. S. 1016 (1994), and now reverse.

## II

Under the Medicare reimbursement scheme at issue here, participating hospitals furnish services to program beneficiaries and are reimbursed by the Secretary through fiscal intermediaries. See 42 U. S. C. §§ 1395g and 1395h (1988 and Supp. V). Hospitals are reimbursed for "reasonable costs," defined by the statute as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." § 1395x(v)(1)(A). The Medicare Act, 79 Stat. 290, as amended, 42 U. S. C. § 1395 *et seq.*, authorizes the Secretary to promulgate regulations "establishing the method or methods to be used" for determining reasonable costs, directing

her in the process to "consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing" reimbursement amounts. § 1395x(v)(1)(A).

The Secretary has promulgated, and updated on an annual basis, regulations establishing the methods for determining reasonable cost reimbursement. See *Good Samaritan Hospital* v. *Shalala*, 508 U. S. 402, 404–407 (1993). The relevant provisions can be found within 42 CFR pt. 413 (1994). Respondent contends that two of these regulations, §§ 413.20(a) and 413.24, mandate reimbursement according to GAAP, and the Secretary counters that neither does.

## A

Section 413.20(a) provides as follows:

> "The principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. Standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement. Essentially the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries."

Assuming, *arguendo*, that the "[s]tandardized definitions, accounting, statistics, and reporting practices" referred to by the regulation refer to GAAP, that nevertheless is just the beginning, not the end, of the inquiry. The decisive question still remains: Who is it that "follow[s]" GAAP, and for what purposes? The Secretary's view is that § 413.20(a) ensures

the existence of adequate provider records but does not dictate her own reimbursement determinations. We are persuaded that the Secretary's reading is correct.

Section 413.20(a) sets forth its directives in an ordered progression. The first sentence directs that providers must maintain records that are sufficient for proper determination of costs. It does not say the records are conclusive of the entire reimbursement process. The second sentence makes it clear to providers that standardized accounting practices are followed. The third sentence reassures providers that changes in their recordkeeping practices and systems are not required in order to determine what costs the provider can recover when principles of reimbursement are applied to the provider's raw cost data. That sentence makes a distinction between recordkeeping practices and systems on one hand and principles of reimbursement on the other. The last sentence confirms the distinction, for it contemplates that a provider's basic financial information is organized according to GAAP as a beginning point from which the Secretary "arrive[s] at equitable and proper payment for services." This is far different from saying that GAAP is by definition an equitable and proper measure of reimbursement.

The essential distinction between recordkeeping requirements and reimbursement principles is confirmed by the organization of the regulations in 42 CFR pt. 413 (1994). Subpart A sets forth introductory principles. Subpart B, containing the regulation here in question, is entitled "Accounting Records and Reports." The logical conclusion is that the provisions in subpart B concern recordkeeping requirements rather than reimbursement, and closer inspection reveals this to be the case. Section 413.20 is the first section in subpart B, and is entitled "Financial data and reports." In addition to § 413.20(a), the other paragraphs in § 413.20 govern the "[f]requency of cost reports," "[r]ecordkeeping requirements for new providers," "[c]ontinuing provider recordkeeping requirements," and "[s]uspension of program

payments to a provider . . . [who] does not maintain . . . adequate records." Not until the following subparts are cost reimbursement matters considered. Subpart C is entitled "Limits on Cost Reimbursement," subpart D "Apportionment [of Allowable Costs]," subpart E "Payments to Providers," and subparts F through H address reimbursement of particular cost categories. The logical sequence of a regulation or a part of it can be significant in interpreting its meaning.

It is true, as the Court of Appeals said, that § 413.20(a) "does not exist in a vacuum" but rather is a part of the overall Medicare reimbursement scheme. 996 F. 2d, at 835. But it does not follow from the fact that a provider's cost accounting is the first step toward reimbursement that it is the only step. It is hardly surprising that the reimbursement process begins with certain recordkeeping requirements.

The regulations' description of the fiscal intermediary's role underscores this interpretation. The regulations direct the intermediary to consult and assist providers in interpreting and applying the principles of Medicare reimbursement to generate claims for reimbursable costs, § 413.20(b), suggesting that a provider's own determination of its claims involves more than handing over its existing cost reports. The regulations permit initial acceptance of reimbursable cost claims, unless there are obvious errors or inconsistencies, in order to expedite payment. § 413.64(f)(2). When a subsequent, more thorough audit follows, it may establish that adjustments are necessary. *Ibid.;* see also §§ 421.100(a), (c). This sequence as well is consistent with the Secretary's view that a provider's cost accounting systems are only the first step in the ultimate determination of reimbursable costs.

The Secretary's position that § 413.20(a) does not bind her to reimburse according to GAAP is supported by the regulation's text and the overall structure of the regulations. It

is a reasonable regulatory interpretation, and we must defer to it. *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994); see also *Martin* v. *Occupational Safety and Health Review Comm'n,* 499 U. S. 144, 151 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers"); *Lyng* v. *Payne,* 476 U. S. 926, 939 (1986) ("agency's construction of its own regulations is entitled to substantial deference").

Respondent argues that, even if § 413.20(a) does not mandate reimbursement according to GAAP, § 413.24 does. This contention need not detain us long. Section 413.24 requires that a provider's cost data be based on the accrual basis of accounting, under which "revenue is reported in the period when it is earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid." § 413.24(b)(2). But GAAP is not the only form of accrual accounting; in fact, both the GAAP approach and PRM § 233 reflect different methods of accrual accounting. See Accounting Principles Board (APB) Opinion No. 26, ¶¶ 5–8, reprinted at App. 64–66 (describing alternative accrual methods of recognizing advance refunding losses, including the one adopted in PRM § 233). Section 413.24 does not, simply by its accrual accounting requirement, bind the Secretary to make reimbursements according to GAAP.

### B

The Secretary's reading of her regulations is consistent with the Medicare statute. Rather than requiring adherence to GAAP, the statute merely instructs the Secretary, in establishing the methods for determining reimbursable costs, to "consider, among other things, the principles generally applied by national organizations or established prepay-

ment organizations (which have developed such principles) in computing the amount of payment . . . to providers of services." 42 U. S. C. § 1395x(v)(1)(A).

Nor is there any basis for suggesting that the Secretary has a statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement. To the extent the Medicare statute's broad delegation of authority imposes a rulemaking obligation, see *ibid.*, it is one the Secretary has without doubt discharged. See *Good Samaritan Hospital* v. *Shalala,* 508 U. S., at 418, and n. 13, 419, n. 15. The Secretary has issued regulations to address a wide range of reimbursement questions. The regulations are comprehensive and intricate in detail, addressing matters such as limits on cost reimbursement, apportioning costs to Medicare services, and the specific treatment of numerous particular costs. As of 1994, these regulations consumed some 640 pages of the Code of Federal Regulations.

As to particular reimbursement details not addressed by her regulations, the Secretary relies upon an elaborate adjudicative structure which includes the right to review by the Provider Reimbursement Review Board, and, in some instances, the Secretary, as well as judicial review in federal district court of final agency action. 42 U. S. C. § 1395oo(f)(1); see *Bethesda Hospital Assn.* v. *Bowen,* 485 U. S. 399, 400–401 (1988). That her regulations do not resolve the specific timing question before us in a conclusive way, or "could use a more exact mode of calculating," does not, of course, render them invalid, for the "methods for the estimation of reasonable costs" required by the statute only need be "generalizations [that] necessarily will fail to yield exact numbers." *Good Samaritan, supra,* at 418. The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication. See *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267

(1974); *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947). The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate.

### III

We also believe it was proper for the Secretary to issue a guideline or interpretive rule in determining that defeasance losses should be amortized. PRM § 233 is the means to ensure that capital-related costs allowable under the regulations are reimbursed in a manner consistent with the statute's mandate that the program bear neither more nor less than its fair share of costs. 42 U. S. C. § 1395x(v)(1)(A)(i) ("[T]he necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare]"). The Secretary has promulgated regulations authorizing reimbursement of capital-related costs such as respondent's that are "appropriate and helpful in . . . maintaining the operation of patient care facilities," 42 CFR § 413.9(b)(2) (1994); see generally §§ 413.130–413.157, including "[n]ecessary and proper interest" and other costs associated with capital indebtedness, § 413.153(a)(1); see also §§ 413.130(a)(7) and (g). The only question unaddressed by the otherwise comprehensive regulations on this particular subject is whether the loss should be recognized at once or spread over a period of years. It is at this step that PRM § 233 directs amortization.

Although one-time recognition in the initial year might be the better approach where the question is how best to portray a loss so that investors can appreciate in full a company's financial position, see APB Opinion 26, ¶¶ 4–5, reprinted at App. 64, the Secretary has determined in PRM § 233 that amortization is appropriate to ensure that Medicare only reimburse its fair share. The Secretary must calculate how much of a provider's total allowable costs are

attributable to Medicare services, see 42 CFR §§ 413.5(a), 413.9(a), and (c)(3) (1994), which entails calculating what proportion of the provider's services were delivered to Medicare patients, §§ 413.50 and 413.53. This ratio is referred to as the provider's "Medicare utilization." App. to Pet. for Cert. 49a. In allocating a provider's total allowable costs to Medicare, the Secretary must guard against various contingencies. The percentage of a hospital's patients covered by Medicare may change from year to year; or the provider may drop from the Medicare program altogether. Either will cause the hospital's Medicare utilization to fluctuate. Given the undoubted fact that Medicare utilization will not be an annual constant, the Secretary must strive to assure that costs associated with patient services provided over time be spread, to avoid distortions in reimbursement. As the provider's yearly Medicare utilization becomes ascertainable, the Secretary is able to allocate costs with accuracy and the program can bear its proportionate share. Proper reimbursement requires proper timing. Should the Secretary reimburse in one year costs in fact attributable to a span of years, the reimbursement will be determined by the provider's Medicare utilization for that one year, not for later years. This leads to distortion. If the provider's utilization rate changes or if the provider drops from the program altogether the Secretary will have reimbursed up front an amount other than that attributable to Medicare services. The result would be cross-subsidization, *id.*, at 50a, which the Act forbids. 42 U. S. C. § 1395x(v)(1)(A)(i).

That PRM § 233 implements the statutory ban on cross-subsidization in a reasonable way is illustrated by the Administrator's application of § 233 to the facts of this case. The Administrator found that respondent's loss "did not relate exclusively to patient care services rendered in the year of the loss . . . . [but were] more closely related to [patient care services in] the years over which the original bond term extended." App. to Pet. for Cert. 49a. Because the loss

was associated with patient services over a period of time, the Administrator concluded that amortization was required to avoid the statutory ban on cross-subsidization:

> "The statutory prohibition against cross-subsidization [citing the provision codified at 42 U. S. C. § 1395x (v)(1)(A)], requires that costs recognized in one year, but attributable to health services rendered over a number of years, be amortized and reimbursed during those years when Medicare beneficiaries use those services." *Id.*, at 50a (footnote omitted).

> "By amortizing the loss to match it to Medicare utilization over the years to which it relates, the program is protected from any drop in Medicare utilization, and the provider is likewise assured that it will be adequately reimbursed if Medicare utilization increases. Further, the program is protected from making a payment attributable to future years and then having the provider drop out of the Program before services are rendered to Medicare beneficiaries in those future years." *Id.*, at 49a (footnote omitted).

As an application of the statutory ban on cross-subsidization and the regulatory requirement that only the actual cost of services rendered to beneficiaries during a given year be reimbursed, 42 U. S. C. § 1395x(v)(1)(A)(i); 42 CFR § 413.9 (1994), PRM § 233 is a prototypical example of an interpretive rule " 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 302, n. 31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947)). Interpretive rules do not require notice and comment, although, as the Secretary recognizes, see Foreword to PRM, they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process, *ibid.*

We can agree that APA rulemaking would still be required if PRM § 233 adopted a new position inconsistent with any of the Secretary's existing regulations. As set forth in Part II, however, her regulations do not require reimbursement according to GAAP. PRM § 233 does not, as the Court of Appeals concluded it does, "effec[t] a substantive change in the regulations." 996 F. 2d, at 832.

## IV

There is much irony in the suggestion, made in support of the Hospital's interpretation of the statute and regulations, that the Secretary has bound herself to delegate the determination of any matter not specifically addressed by the regulations to the conventions of financial accounting that comprise GAAP. The Secretary in effect would be imposing upon herself a duty to go through the time-consuming rulemaking process whenever she disagrees with any announcements or changes in GAAP and wishes to depart from them. Examining the nature and objectives of GAAP illustrates the unlikelihood that the Secretary would choose that course.

Contrary to the Secretary's mandate to match reimbursement with Medicare services, which requires her to determine with some certainty just when and on whose account costs are incurred, GAAP "do[es] not necessarily parallel economic reality." R. Kay & D. Searfoss, Handbook of Accounting and Auditing, ch. 5, p. 7 (2d ed. 1989). Financial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a "process [that] involves continuous judgments and estimates." Id., ch. 5, at 7–8. In guiding these judgments and estimates, "financial accounting has as its foundation the principle of conservatism, with its corollary that 'possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets.'" Thor Power Tool Co. v. Commissioner, 439 U. S. 522, 542 (1979) (citation omitted). This orientation may be consistent with the ob-

jective of informing investors, but it ill serves the needs of Medicare reimbursement and its mandate to avoid cross-subsidization. Cf. *id.*, at 543 ("[T]he accountant's conservatism cannot bind the Commissioner [of the IRS] in his efforts to collect taxes").

GAAP is not the lucid or encyclopedic set of pre-existing rules that the dissent might perceive it to be. Far from a single-source accounting rulebook, GAAP "encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." Kay & Searfoss, ch. 5, at 7 (1994 Update). GAAP changes and, even at any one point, is often indeterminate. "[T]he determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles." *Ibid.* There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question. *Id.*, ch. 5, at 6–7. When such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow. *Ibid.* We think it is a rather extraordinary proposition that the Secretary has consigned herself to this process in addressing the timing of Medicare reimbursement.

The framework followed in this case is a sensible structure for the complex Medicare reimbursement process. The Secretary has promulgated regulations setting forth the basic principles and methods of reimbursement, and has issued interpretive rules such as PRM § 233 that advise providers how she will apply the Medicare statute and regulations in adjudicating particular reimbursement claims. Because the Secretary's regulations do not bind her to make Medicare reimbursements in accordance with GAAP, her determination in PRM § 233 to depart from GAAP by requiring bond defeasance losses to be amortized does not amount to a substantive change to the regulations. It is a valid interpretive rule, and it was reasonable for the Secretary to follow that

policy here to deny respondent's claim for full reimbursement of its defeasance loss in 1985.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA, JUSTICE SOUTER, and JUSTICE THOMAS join, dissenting.

Unlike the Court, I believe that general Medicare reporting and reimbursement regulations require provider costs to be treated according to "generally accepted accounting principles." As a result, I would hold that contrary guidelines issued by the Secretary of Health and Human Services in an informal policy manual and applied to determine the timing of reimbursement in this case are invalid for failure to comply with the notice and comment procedures established by the Administrative Procedure Act, 5 U. S. C. § 553. Because the Court holds to the contrary, I respectfully dissent.

I

It is undisputed, as the Court notes, *ante,* at 90, that respondent, Guernsey Memorial Hospital (Hospital), is entitled to reimbursement for the reasonable advance refunding costs it incurred when it refinanced its capital improvement bonds in 1985. The only issue here is one of timing: whether reimbursement is to be made in a lump sum in the year of the refinancing, in accordance with generally accepted accounting principles (known in the accounting world as GAAP), or in a series of payments over the remaining life of the original bonds, as the Secretary ultimately concluded after applying § 233 of the Medicare Provider Reimbursement Manual (PRM). The Hospital challenged the Secretary's reimbursement decision under the Medicare Act, 42 U. S. C. § 1395oo(f), which incorporates the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.* (1988 ed. and Supp. V), by reference. Under the governing standard, reviewing courts are to "hold

unlawful and set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. § 706(2)(A). We must give substantial deference to an agency's interpretation of its own regulations, *Lyng* v. *Payne,* 476 U. S. 926, 939 (1986), but an agency's interpretation cannot be sustained if it is " 'plainly erroneous or inconsistent with the regulation.' " *Stinson* v. *United States,* 508 U. S. 36, 45 (1993) (quoting *Bowles* v. *Seminole Rock & Sand Co.,* 325 U. S. 410, 414 (1945)). In my view, that is the case here.

The Medicare Act requires that, for reimbursement purposes, the actual reasonable costs incurred by a provider "shall be determined in accordance with regulations establishing the method or methods to be used . . . in determining such costs." 42 U. S. C. § 1395x(v)(1)(A). The Secretary's regulations similarly provide that the "[r]easonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included." 42 CFR § 413.9(b)(1) (1994). The Secretary is not bound to adopt GAAP for reimbursement purposes; indeed, the statute only requires that, in promulgating the necessary regulations, "the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment . . . to providers of services . . . ." 42 U. S. C. § 1395x(v)(1)(A). Neither the Hospital nor the Court of Appeals disputes that the Secretary has broad and flexible authority to prescribe standards for reimbursement. See *Good Samaritan Hospital* v. *Shalala,* 508 U. S. 402, 418, n. 13 (1993).

Nevertheless, the statute clearly contemplates that the Secretary will state the applicable reimbursement methods in regulations—including default rules that cover a range of situations unless and until specific regulations are promulgated to supplant them with respect to a particular type of

cost. Indeed, despite the Court's suggestion to the contrary, *ante,* at 96, only by employing such default rules can the Secretary operate the sensible, comprehensive reimbursement scheme that Congress envisioned. Otherwise, without such background guidelines, providers would not have the benefit of regulations establishing the accounting principles upon which reimbursement decisions will be based, and administrators would be free to select, without having to comply with notice and comment procedures, whatever accounting rule may appear best in a particular context (so long as it meets minimum standards of rationality). In my view, the question becomes simply whether the Secretary has in fact adopted GAAP as the default rule for cost reimbursement accounting.

Like the Court, see *ante,* at 95–96, I do not think that 42 CFR § 413.24(a) (1994), which provides that Medicare cost data "must be based on . . . the accrual basis of accounting," requires the use of GAAP. As the regulation itself explains, "[u]nder the accrual basis of accounting, revenue is reported in the period when it is earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid." § 413.24(b)(2). This definition of "accrual basis" simply incorporates the dictionary understanding of the term, thereby distinguishing the method required of cost providers from "cash basis" accounting (under which revenue is reported only when it is actually received and expenses are reported only when they are actually paid). GAAP employs the generally accepted form of accrual basis accounting, but not the only possible form. In fact, both the applicable GAAP rule, established by Early Extinguishment of Debt, Accounting Principles Board Opinion No. 26 (1972), reprinted at App. 62, and PRM § 233 appear to reflect accrual, as opposed to cash basis, accounting principles.

Although § 413.24 simply opens the door for the Secretary to employ GAAP, § 413.20 makes clear that she has, in fact,

incorporated GAAP into the cost reimbursement process. That section provides that "[s]tandardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed." § 413.20(a). As the Court of Appeals noted, "[i]t is undisputed, in the case at bar, that Guernsey Memorial Hospital keeps its books on the accrual basis of accounting and in accordance with generally accepted accounting principles." *Guernsey Memorial Hospital* v. *Secretary of HHS*, 996 F. 2d 830, 834 (CA6 1993). Similarly, related entities in the health care field employ GAAP as their standardized accounting practices. See American Institute of Certified Public Accountants, Audits of Providers of Health Care Services § 3.01, p. 11 (1993) ("Financial statements of health care entities should be prepared in conformity with generally accepted accounting principles"); Brief for American Hospital Association et al. as *Amici Curiae* 7–8 ("Generally accepted accounting principles have always provided the standard definitions and accounting practices applied by nongovernment hospitals in maintaining their books and records"). Accordingly, the Secretary concedes that, under § 413.20, the Hospital at the very least was required to submit its request for Medicare reimbursement in accordance with GAAP. *Guernsey Memorial Hospital* v. *Sullivan*, 796 F. Supp. 283, 288–289 (SD Ohio 1992); Tr. of Oral Arg. 8.

The remainder of § 413.20 demonstrates, moreover, that the accounting practices commonly used in the health care field determine how costs will be reimbursed by Medicare, not just how they are to be reported. The first sentence of § 413.20(a) begins with a statement that the provision explains what "[t]he principles of *cost reimbursement* require." (Emphasis added.) And the sentence emphasizing that standardized accounting and reporting practices "are followed" is itself accompanied by the promise that "[c]hanges in these practices and systems will not be required in order to determine costs payable [that is, reimbursable] under the

principles of reimbursement." The language of the regulation, taken as a whole, indicates that the accounting system maintained by the provider ordinarily forms the basis for determining how Medicare costs will be reimbursed. I find it significant that the Secretary, through the Administrator of the Health Care Finance Administration, has changed her interpretation of this regulation, having previously concluded that this provision generally requires the costs of Medicare providers to be reimbursed according to GAAP when that construction was to her benefit. See *Dr. David M. Brotman Memorial Hospital* v. *Blue Cross Assn./Blue Cross of Southern California*, HCFA Admin. Decision, CCH Medicare and Medicaid Guide ¶ 30,922, p. 9839 (1980) (holding that, "[u]nder 42 CFR 405.406 [now codified as § 413.20], the determination of costs payable under the program should follow standardized accounting practices" and applying the GAAP rule—that credit card costs should be treated as expenses in the period incurred—and not the PRM's contrary rule—that such costs should be considered reductions of revenue).

Following the Secretary's current position, the Court concludes, *ante*, at 92–93, that § 413.20 was intended to do no more than reassure Medicare providers that they would not be required fundamentally to alter their accounting practices for reporting purposes. Indeed, the Court maintains, the regulation simply ensures the existence of adequate provider financial records, maintained according to widely accepted accounting practices, that will enable the Secretary to calculate the costs payable under the Medicare program using some other systemwide method of determining costs, which method she does not, and need not, state in any regulations. For several reasons, I find the Court's interpretation of § 413.20 untenable.

Initially, the Court's view is belied by the text and structure of the regulations. As the Court of Appeals noted, "the sentence in [§ 413.20(a)] that says standardized reporting

practices 'are followed' does not exist in a vacuum." 996 F. 2d, at 835. The Provider Reimbursement Review Board has explained: "[T]he purpose of cost reporting is to enable a hospital's costs to be known so that its reimbursement can be calculated. For that reason, there must be some consistency between the fundamental principles of cost reporting and those principles used for cost reimbursement." *Fort Worth Osteopathic Medical Center* v. *Blue Cross and Blue Shield Ass'n/Blue Cross and Blue Shield of Texas*, CCH Medicare and Medicaid Guide ¶ 40,413, p. 31,848 (1991). The text of § 413.20 itself establishes this link between cost reporting and cost reimbursement by explaining that a provider hospital generally need not modify its accounting and reporting practices in order to determine what costs Medicare will reimburse. That is, "the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries." § 413.20(a). By linking the reimbursement process to the provider's existing financial records, the regulation contemplates that both the agency and the provider will be able to determine what costs are reimbursable. It would make little sense to tie cost reporting to cost reimbursement in this manner while simultaneously mandating different accounting systems for each.

In addition, as the Court aptly puts it, "[t]he logical sequence of a regulation . . . can be significant in interpreting its meaning." *Ante*, at 94. Consideration of how a provider's claim for reimbursement is processed undermines the Court's interpretation of § 413.20(a). The Court suggests that the fiscal intermediaries who make the initial reimbursement decisions take a hospital's cost report as raw data and apply a separate set of accounting principles to determine the proper amount of reimbursement. In certain situations, namely where the regulations provide for specific departures from GAAP, this is undoubtedly the case. But the

description of the intermediary's role in the regulations contemplates reliance on the GAAP-based cost report *as determining reimbursable costs* in considering the ordinary claim. See, *e. g.,* § 413.60(b) (providing that, "[a]t the end of the [reporting] period, the actual apportionment, *based on the cost finding and apportionment methods selected by the provider, determines* the Medicare reimbursement for the actual services provided to beneficiaries during the period" (emphasis added)); § 413.64(f)(2) ("In order to reimburse the provider as quickly as possible, an initial retroactive adjustment will be made as soon as the cost report is received. For this purpose, *the costs will be accepted as reported, unless there are obvious errors or inconsistencies, subject to later audit.* When an audit is made and the final liability of the program is determined, a final adjustment will be made" (emphasis added)). The fiscal intermediary, then, is essentially instructed to check the hospital's cost report for accuracy, reasonableness, and presumably compliance with the regulations. But that task seems to operate within the framework of the hospital's normal accounting procedure—*i. e.,* GAAP— and not some alternative, uncodified set of accounting principles employed by the Secretary. See generally 42 CFR §§ 421.1–421.128 (1994).

I take seriously our obligation to defer to an agency's reasonable interpretation of its own regulations, particularly "when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994) (quoting *Pauley* v. *BethEnergy Mines, Inc.,* 501 U. S. 680, 697 (1991)). In this case, however, the Secretary advances a view of the regulations that would force us to conclude that she has not fulfilled her statutory duty to promulgate regulations determining the methods by which reasonable Medicare costs are to be

calculated. If § 413.20 does not incorporate GAAP as the basic method for determining cost reimbursement in the absence of a more specific regulation, then there is *no* regulation that specifies an overall methodology to be applied in the cost determination process. Given that the regulatory scheme could not operate without such a background method, and given that the statute requires the Secretary to make reimbursement decisions "in accordance with regulations establishing the method or methods to be used," 42 U. S. C. § 1395x(v)(1)(A), I find the Secretary's interpretation to be unreasonable and unworthy of deference.

Unlike the Court, therefore, I would hold that § 413.20 requires the costs incurred by Medicare providers to be reimbursed according to GAAP in the absence of a specific regulation providing otherwise. The remainder of my decision flows from this conclusion. PRM § 233, which departs from the GAAP rule concerning advance refunding losses, does not have the force of a regulation because it was promulgated without notice and comment as required by the Administrative Procedure Act, 5 U. S. C. § 553. And, contrary to the Secretary's argument, PRM § 233 cannot be a valid "interpretation" of the Medicare regulations because it is clearly at odds with the meaning of § 413.20 itself. Thus, I would conclude that the Secretary's refusal, premised upon an application of PRM § 233, to reimburse the Hospital's bond defeasement costs in accordance with GAAP was invalid.

## II

The remaining arguments advanced by the Court in support of the Secretary's position do not alter my view of the regulatory scheme. The Court suggests that a contrary decision, by requiring the Secretary to comply with the notice and comment provisions of the Administrative Procedure Act in promulgating reimbursement regulations, would impose an insurmountable burden on the Secretary's administration of the Medicare program. I disagree. Congress obviously

thought that the Secretary could manage that task when it required that she act by regulation. Moreover, despite the Court's suggestion, *ante*, at 96, nothing in my position requires the agency to adopt substantive rules addressing every detailed and minute reimbursement issue that might arise. An agency certainly cannot foresee every factual scenario with which it may be presented in administering its programs; to fill in the gaps, it must rely on adjudication of particular cases and other forms of agency action, such as the promulgation of interpretive rules and policy statements, that give effect to the statutory principles and the background methods embodied in the regulations. Far from being foreclosed from case-by-case adjudication, the Secretary is simply obligated, in making those reimbursement decisions, to abide by whatever ground rules she establishes by regulation. Under the Court's reading of the regulations, the Secretary in this case did not apply any accounting principle found in the regulations to the specific facts at issue—and indeed could not have done so because no such principles are stated outside the detailed provisions governing particular reimbursement decisions. I believe that the Medicare Act's command that reimbursement requests by providers be evaluated "in accordance with regulations establishing the method or methods to be used" precludes this result.

Moreover, I find it significant that the bond defeasement situation at issue here *was* foreseen. If the Secretary had the opportunity to include a section on advance refunding costs in the PRM, then she could have promulgated a regulation to that effect in compliance with the Administrative Procedure Act, thereby giving the public a valuable opportunity to comment on the regulation's wisdom and those adversely affected the chance to challenge the ultimate rule in court. An agency is bound by the regulations it promulgates and may not attempt to circumvent the amendment process through substantive changes recorded in an informal policy

manual that are unsupported by the language of the regulation. Here, Congress expressed a clear policy in the Medicare Act that the reimbursement principles selected by the Secretary—whatever they may be—must be adopted subject to the procedural protections of the Administrative Procedure Act. I would require the Secretary to comply with that statutory mandate.

The PRM, of course, remains an important part of the Medicare reimbursement process, explaining in detail what the regulations lay out in general and providing those who must prepare and process claims with the agency's statements of policy concerning how those regulations should be applied in particular contexts. One role for the manual, therefore, is to assist the Secretary in her daunting task of overseeing the thousands of Medicare reimbursement decisions made each year. As the foreword to the PRM explains, "[t]he procedures and methods set forth in this manual have been devised to accommodate program needs and the administrative needs of providers and their intermediaries and will assure that the reasonable cost regulations are uniformly applied nationally without regard to where covered services are furnished." Indeed, large portions of the PRM are devoted to detailed examples, including step-by-step calculations, of how certain rules should be applied to particular facts. The manual also provides a forum for the promulgation of interpretive rules and general statements of policy, types of agency action that describe what the agency believes the statute and existing regulations require but that do not alter the substantive obligations created thereby. Such interpretive rules are exempt from the notice and comment provisions of the Administrative Procedure Act, see 5 U. S. C. § 553(b)(A), but they must *explain* existing law and not *contradict* what the regulations require.

As a result, the policy considerations upon which the Court focuses, see *ante*, at 97–100, are largely beside the point. Like the Court of Appeals, I do not doubt that the

amortization approach embodied in PRM § 233 "squares with economic reality," 996 F. 2d, at 834, and would likely be upheld as a rational regulation were it properly promulgated. Nor do I doubt that amortization of advance refunding costs may have certain advantages for Medicare reimbursement purposes. It is certainly true that the Act prohibits the Medicare program from bearing more or less than its proper share of hospital costs, 42 U. S. C. § 1395x(v)(1)(A)(i), but immediate recognition of advance refunding losses does not violate this principle. While the Court, like the Secretary, assumes that advance refunding costs are properly attributed to health care services rendered over a number of years, it does not point to any evidence in the record substantiating that proposition. In fact, what testimony there is supports the view that it is appropriate to recognize advance refunding losses in the year of the transaction because the provider no longer carries the costs of the refunded debt on its books thereafter; the losses in question simply represent a one-time recognition of the difference between the net carrying costs of the old bonds and the price necessary to reacquire them. See, e. g., App. 14–15, 22. While reasonable people may debate the merits of the two options, the point is that both appear in the end to represent economically reasonable and permissible methods of determining what costs are properly reimbursable and when. Given that neither approach is commanded by the statute, the cross-subsidization argument should not alter our reading of § 413.20.

Finally, the Secretary argues that she was given a "broad and flexible mandate" to prescribe standards for Medicare reimbursement, and that, as a result, "it is exceedingly unlikely that the Secretary would have intended, in general regulations promulgated as part of the initial implementation of the Medicare Act, to abdicate to the accounting profession (or to anyone else) ultimate responsibility for making particular cost reimbursement determinations." Brief for Petitioner 19. She points out that the purpose of Medicare

reimbursement, to provide payment of the necessary costs of efficient delivery of covered services to Medicare beneficiaries, may not be identical to the objective of financial accounting, which is "to provide useful information to management, shareholders, creditors, and others properly interested" and "has as its foundation the principle of [financial] conservatism." *Thor Power Tool Co.* v. *Commissioner*, 439 U. S. 522, 542 (1979) (rejecting taxpayer's assertion that an accounting principle that conforms to GAAP must be presumed to be permissible for tax purposes). The Court makes this argument as well. See *ante*, at 100–101.

Reading the regulations to employ GAAP, even though it is possible that the relevant reimbursement standard will change over time as the position of the accounting profession evolves, does not imply an abdication of statutory authority but a necessary invocation of an established body of accounting principles to apply where specific regulations have not provided otherwise. The Secretary is, of course, not bound by GAAP in such a situation and, indeed, has promulgated reimbursement *regulations* that depart from the GAAP default rule in specific situations. Compare, *e. g.*, § 413.134 (f)(2) (limited recognition of gain or loss on involuntary conversion of depreciable asset) with R. Kay & D. Searfoss, Handbook of Accounting and Auditing, ch. 15, p. 14 (2d ed. 1989 and 1994 Supp.) (gains or losses are recognized under GAAP in the period of disposal of a depreciable asset, even if reinvested in a similar asset). The Secretary would also be free to devise a reimbursement scheme that does not involve GAAP as a background principle at all if she believes, as the Court argues, that use of GAAP binds her to a cost allocation methodology ill suited to Medicare reimbursement, see *ante*, at 101. Our task is simply to review the regulations the Secretary has in fact adopted, and I conclude that the Secretary has incorporated GAAP as the reimbursement default rule.

## III

Contrary to the Court's conclusion, I do not believe that the Administrator's reimbursement decision can be defended as a rational application of the statute and the existing regulations. The Hospital sought reimbursement for its advance refunding costs in accordance with GAAP and in compliance with the Secretary's published regulations. The Administrator applied PRM § 233, which calls for a departure from GAAP in this instance, to deny the Hospital's request; that decision contradicted the agency's own regulations and therefore resulted in a reimbursement decision that was "not in accordance with law" within the meaning of the Administrative Procedure Act, 5 U. S. C. § 706(2)(A). I agree with the court below that "[t]he 'nexus' that exists in the regulations between cost reporting and cost reimbursement is too strong . . . to be broken by a rule not adopted in accordance with the rulemaking requirements of the Administrative Procedure Act." 996 F. 2d, at 836. Because the Court holds otherwise, I respectfully dissent.