John J. MCGOWAN, Plaintiff–Appellant,

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant–Appellee.

No. 97–2700.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1998.

Decided Feb. 5, 1998.

Richard D. Raskin (argued), James C. Dechene, Jason G. New, Sidley & Austin, Chicago, IL, for Plaintiff–Appellant.

Matthew V. Richmond, Office of the United States Attorney, Milwaukee, WI, John E. Bizot (argued), Department of Health and Human Services, Region V, Social Security Administration, Chicago, IL for Defendant–Appellee.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

When John McGowan enrolled in the Medicare program, he signed a form accepting Part A coverage and declining Part B coverage. Part A of Medicare covers the cost of hospital services and is free; Part B covers physicians' services and requires a premium, deducted from Social Security retirement benefits. At the time of his enrollment McGowan was covered by his employer's medical plan, and Part B would have duplicated coverage he already enjoyed. But five months later, when McGowan's private insurance ended, he did not opt into the Part B coverage—although he could have done so during the "special enrollment period" that lasts seven months after the termination of private insurance. 42 U.S.C. § 1395q(e); 42 C.F.R. §§ 407.20(a)(3), (e)(2), (g)(1), 407.25(c)(2)(i) (1994). (Some of the regulations have been revised or renumbered since the events that produced this litigation; we cite the versions in force when McGowan applied.) A year after his private insurance lapsed, McGowan had coronary bypass surgery. The United States declined to pay bills submitted under Part B, and McGowan had to lay out approximately $15,000 for uncovered services. He filed this suit under 42 U.S.C. §§ 1395p and 1395ff seeking an order that would compel the Department of Health and Human Services to enroll him in the program retroactive to his initial eligibility, pay the bills from his surgery, and eliminate the 10% surcharge that he must now bear as a late enrollee.

McGowan seeks relief under 42 U.S.C. § 1395p(h):

In any case where the Secretary finds that an individual's enrollment or nonenrollment in the insurance program established by [Part B] ... is unintentional, inadvertent, or erroneous and is the result of the error, misrepresentation, or inaction of an officer, employee, or agent of the Federal government, ... the Secretary may take such action (including the designation for such individual of a special initial or subsequent enrollment period ... ) as may be necessary to correct or eliminate the ef-

fects of such error, misrepresentation, or inaction.

Under this statute and the corresponding regulation, 42 C.F.R. § 407.32, McGowan must establish first that his nonenrollment was "unintentional, inadvertent, or erroneous" and second that the problem is attributable to an "error, misrepresentation, or inaction" of a federal employee. McGowan argues that his failure to read the enrollment form before signing it, coupled with his confusion between Part B coverage and the "Medigap" insurance (which covers deductibles and copayments in the Medicare program) that he had already purchased, renders his decision "unintentional". As for the "error, misrepresentation, or inaction" at HHS, McGowan points to the office's policy of discouraging people covered by private insurance from electing Part B coverage, plus its failure to ensure that he grasped the difference between Part B and Medigap insurance. An administrative law judge agreed with McGowan on both points, but the Appeals Council agreed with him on neither. It concluded that he knowingly declined coverage and that the ready availability of written materials describing the Medicare programs—coupled with McGowan's concession that the employee who took his application did not furnish any incorrect information—precluded a finding that a federal employee's "error, misrepresentation, or inaction" was responsible. A magistrate judge, who rendered a final decision by consent under 28 U.S.C. § 636(c), split the difference. The magistrate judge agreed with McGowan that his failure to elect Part B coverage was "unintentional" but concluded that substantial evidence supports the Appeals Council's decision on the "error" issue.

■ In this court the Secretary has opted to defend the magistrate judge's decision and does not contest McGowan's argument that his decision was "unintentional." That leaves the question whether the decision was the result of a federal employee's "error, misrepresentation, or inaction"—more precisely, whether substantial evidence supports the Secretary's decision (through her delegate the Appeals Council) that it was not. McGowan's principal sally is that any effort to discourage applicants covered by insurance from choosing Part B coverage is an "error". This position has the benefit of

avoiding factual disputes on which the Secretary receives the benefit of deferential judicial review; the Chicago office at which McGowan applied admits that it provides this advice. But it has the disadvantage of being wrong. Why should we apply the label "error" to advice that tends to save applicants money, accelerate their eligibility for coverage, or both? Most people who have insurance through an employer's plan would not receive any benefit from Part B coverage but would still be required to pay. Telling people how they can save money does not strike us as an example of a governmental "error". Advice not to enroll on October 1991 (when he joined Part A) actually permitted McGowan to receive Part B coverage sooner than he would have had he signed up then. Someone who joins the Part A program after initial eligibility (as McGowan did) cannot start Part B coverage immediately. To prevent people from waiting until they become ill and then seeking immediate coverage without contributing while healthy (a problem that in private insurance markets is called "adverse selection"), Congress established waiting periods. An applicant in October 1991 would have been enrolled in Part B during a "general enrollment period" beginning in January 1992, but coverage would not have commenced until July 1, 1992. See 42 U.S.C. § 1395q(a)(2)(E), 42 C.F.R. § 407.25(b)(1). McGowan's coverage under his employer's group plan expired at the end of February 1992, so electing Part B in October 1991 would have produced a four-month lapse in coverage. People who substitute Part B coverage for private insurance do not pose the same risk of adverse selection, so for them there is no waiting period. By applying for Part B coverage when his private coverage ended, McGowan could have started Part B coverage as of March 1, 1992. See 42 U.S.C. § 1395q(e); 42 C.F.R. §§ 407.20(e)(2), (g)(1), 407.25(c)(2)(i). The problem thus was not the advice he received in October 1991, but his failure to act in the spring of 1992.

That failure McGowan seeks to lay at the feet of HHS. He did not apply, he says, because he believed that "Medigap" coverage, which he had purchased from a private insurer, is the same thing as Part B coverage, and the person who took his application did not disabuse him of this misunderstanding. That's a culpable "inaction", McGowan submits. One difficulty with this position is that McGowan's own version of the interview does not contain anything that would have implied to a reasonable Social Security employee that he *was* confused. Many people have Medigap coverage; mentioning the word does not suggest bewilderment. Federal employees are not mind readers; they can't clear up haze they don't perceive. Doubtless all this "Part A" and "Part B" and "Medigap" lingo is perplexing for a person whose medical insurance has been provided by an employer, and who has never before had to wrestle with such choices. Still, intake workers at Social Security offices can't deliver what would amount to short law school courses on the operation of the Medicare system and its relation to private insurance markets. The next man in line would grow a beard before being served—and the person whose ear was being bent would not remember much anyway. Far better to describe the structure of the programs in writing, which people may read (and reread) at home. That is what HHS does. Offices are festooned with placards and extra publications, and notices sent to eligible persons repeat the advice. The *Medicare Handbook* prepared by the Health Care Financing Administration contains everything McGowan needed to know. Apparently he did not read it any more than he read the enrollment form. Yet he is literate and does not claim to have any difficulty understanding written forms and documents. (He claims to have been misled by some tiny type on the form awarding him Part A coverage, which is possible only if he is an avid reader of documents—yet other language on the same form explained his coverage and options accurately.) More than 37 million persons receive benefits under the Medicare program, which would be impossible to administer if courts disregarded printed advice and insisted that office workers repeat everything orally. Given the volume of applications, employees of HHS can't remember years later what they told any one applicant; placing reliance on what was said (or omitted) orally would invite fabrications by persons who regretted their initial decisions. Most people would like to

avoid paying for Part B coverage but receive its benefits anyway if they turn out to be needed. The Secretary is entitled to take a dim view of claims that superficial oral briefings are culpable "inaction" that justifies retroactive awards. McGowan received in writing all he needed to know, so the Secretary's decision in this case was supported by substantial evidence.

■ McGowan advances a second line of argument: that he was enrolled in Part B automatically under 42 U.S.C. § 1395p(f). Approximately 96% of eligible persons choose Part B coverage (see *1996 HCFA Statistics* Table 2), so treating every eligible person as in unless the beneficiary elects to be out makes good sense—it reduces both paperwork and the number of errors. Section 1395p(f) provides:

Any individual—

(1) who is eligible under section 1395*o* of this title to enroll in the medical insurance program by reason of entitlement to hospital insurance benefits as described in paragraph (1) of such section, and

(2) [w]hose initial enrollment period under subsection (d) of this section begins after March 31, 1973, and

(3) who is residing in the United States, exclusive of Puerto Rico,

shall be deemed to have enrolled in the medical insurance program established by this part.

And the implementing regulation, 42 C.F.R. § 407.17, reads:

(a) *Who is automatically enrolled.* An individual is automatically enrolled for SMI [Part B] if he or she:

(1) Resides in the United States, except in Puerto Rico;

(2) Becomes entitled to hospital insurance under any of the provisions set forth in §§ 406.10 through 406.15 of this chapter; and

(3) Does not decline SMI enrollment.

(b) *Opportunity to decline automatic enrollment.*

(1) SSA will notify an individual that he or she is automatically enrolled under paragraph (a) of this section and grant the individual a specified period (at least 2 months after the month the notice is mailed) to decline enrollment.

(2) The individual may decline enrollment by submitting to SSA or HCFA a signed statement that he or she does not wish SMI.

(3) The statement must be submitted before entitlement begins, or if later, within the time limits set in the notice of enrollment.

McGowan satisfies the statutory eligibility requirements and fits under § 407.17(a)(1) and (2). But he signed a form declining Part B enrollment. The magistrate judge concluded that this is conclusive against McGowan. He responds that under the regulation HHS must notify an eligible person that he is enrolled under § 407.17(b)(1) before it is possible to decline coverage under § 407.17(a)(3) or (b)(2).

McGowan's reading of the regulation puts the cart before the horse. Subsection (b) applies only to persons who have become enrolled under subsection (a). Someone who exercises the option under subsection (a)(3) to decline enrollment never reaches the domain of subsection (b). McGowan's approach—under which someone who has knowingly declined to enroll in Part B must be notified that this decision is ineffectual, and that he stays in unless he opts out a second time—would create a trap even for wary applicants who have private insurance and want to avoid paying twice for the same medical coverage. The statute and regulation set up a Book–of–the–Month–Club approach: every eligible person who does not opt out is in. McGowan's approach, by contrast, means that people are in *even if they opt out.* According to the Health Care Financing Administration report to which we referred above, approximately 1.8 million persons who are covered by Medicare's Part A have elected not to participate in the Part B program. They would be in for a shock if, in order to save $15,000 for John J. McGowan, the Secretary had to re-enroll all of them in Part B and send them bills for insurance they do not want, just because they opted out once rather than twice. If there were any

doubt about this conclusion, we would follow the Secretary's sensible reading of her own regulation. See *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

AFFIRMED.