# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **March 19, 2018**

**NO. A-1-CA-35186**

**PRINCETON PLACE,**

　　　　Petitioner-Appellant,

v.

**NEW MEXICO HUMAN SERVICES DEPARTMENT,**
**MEDICAL ASSISTANCE DIVISION,**

　　　　Respondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Michelle A. Hernandez
Tomas J. Garcia
Albuquerque, NM

for Appellant

New Mexico Human Services Department
Christopher P. Collins, General Counsel
John Robert Emery, Deputy General Counsel
Santa Fe, NM

for Appellee

Lorenz Law

Alice T. Lorenz

Albuquerque, NM

for New Mexico Health Care Association/New Mexico Center for Assisted Living

**OPINION**

**VIGIL, Judge.**

{1}     The district court upheld the decision of the Director of the New Mexico Human Services Department, Medical Assistance Division (HSD/MAD) to recoup Medicaid payments made to Princeton Place (Princeton), a nursing home located in Albuquerque, New Mexico. The claim was that Princeton was not entitled to Medicaid payments for services provided to a resident, J.F., because Princeton did not comply with New Mexico Department of Health (DOH) nursing home preadmission screening regulations before it admitted J.F. On appeal, Princeton contends the administrative record demonstrates that it complied with the applicable preadmission regulations. We agree and reverse.

**BACKGROUND**

**A.     The Federal and New Mexico Nursing Home Preadmission Screening Statutory and Regulatory Framework**

{2}     In 1987, Congress passed the Nursing Home Reform Act (NHRA). *See* Pub. L. No. 100-203, §§ 4201-06, 101 Stat. 1330 (1987) (codified at 42 U.S.C. § 1396r (2012)). The purpose of the NHRA "is to prevent the placement of individuals with [mental illness] or [mental retardation, e.g., intellectual disability][1] in a nursing

---

[1]The terms "mental retardation" and "intellectual disability" are used interchangeably in the federal and New Mexico nursing home and Medicaid statutes

facility unless their medical needs clearly indicate that they require the level of care provided by a nursing facility." Medicare and Medicaid Programs; Preadmission Screening and Annual Resident Review (PASARR), 57 Fed. Reg. 56,450, 56,451 (Nov. 30, 1992). To achieve this purpose, the NHRA requires that each state receiving federal Medicaid funding establish a program to screen all individuals seeking admission to a nursing home for mental illness and intellectual disability prior to admission. 42 U.S.C. § 1396a(a)(28)(D)(I) (2012); 42 U.S.C. § 1396r(e)(7)(A)-(B); 42 C.F.R. § 483.104 (2012); 42 C.F.R. § 483.106(a)(1) (2012). This screening is known as the "PASARR" process. *See* 42 C.F.R. § 483.100 (2012).

{3}    Medicaid states are eligible to receive Federal Financial Participation (FFP) at a rate of seventy-five percent to reimburse nursing homes for services provided to Medicaid-eligible individuals determined, in accordance with the PASARR process, to need nursing home care. *See* 42 U.S.C. § 1396b (2012); 42 C.F.R. § 483.122(a) (2012); 57 Fed. Reg. at 56,451, 56,481. To qualify for Medicaid reimbursement, a nursing home is required to enter into a Medicaid Provider Participation Agreement (MPPA) with the state, under which the nursing home agrees to follow all state and federal Medicaid statutes and regulations, including PASARR requirements.

{4}    Pursuant to the federal PASARR regulations, Medicaid states are required to

and regulations. We follow suit and likewise do so in this opinion.

establish a two-level preadmission screening process for nursing home applicants. *See* 42 C.F.R. § 483.128(a) (2012). At Level I, states "must identify all individuals who are suspected of having" mental illness or intellectual disability as defined by the federal regulations. *Id.*; *see* 42 C.F.R. § 483.102(a)-(b) (2012) (defining mental illness and intellectual disability for purposes of PASARR). States may delegate the authority to conduct Level I screens to nursing homes operating under an MPPA. *See* 57 Fed. Reg. at 56,460. However, when individuals are identified as suspected of having mental illness or intellectual disability at Level I, they must be referred back to the states' PASARR programs for Level II screening. *See* 42 C.F.R. § 483.106(e)(1)-(3). At Level II, states are required to evaluate and determine whether nursing home services or other specialized services are actually needed for identified nursing home applicants. 42 C.F.R. § 483.128(a). The Level II evaluations and determinations are thereafter provided to the applicants and admitting nursing homes. 42 C.F.R. § 483.128(i)(l). And where nursing home services are deemed appropriate for a particular applicant, the admitting nursing home may admit the applicant. 42 C.F.R. § 483.116(a) (2012).

{5}　　In New Mexico, the State's PASARR program is housed within the DOH Developmental Disabilities Division. The State's PASARR program is responsible for ensuring that preadmission screening of all nursing home applicants is completed

prior to any applicant's admission to a nursing home. When all PASARR requirements have been satisfied and an applicant has been admitted to a nursing home, HSD/MAD is responsible for processing the nursing home's claims for Medicaid reimbursement. HSD/MAD is also responsible for seeking recoupment of Medicaid funds that have been paid to nursing homes when the PASARR requirements have not been satisfied.

**B. Princeton's Preadmission Screening of J.F. and HSD/MAD's Proposed Medicaid Recoupment Action**

{6} In June 2011, J.F. underwent a Level I PASARR screening for admission to Princeton, which at the time was operating under an MPPA with the State of New Mexico. J.F. was born with spina bifida, a congenital condition of the central nervous system that affects the development of the spinal cord and brain. At the time that he applied for admission to Princeton, J.F.'s condition had deteriorated to the point that he required assistance with his activities of daily living including eating, toileting, bathing, dressing, and ambulation.

{7} Princeton's admission coordinator and licensed practical nurse, Vivian Richer, conducted J.F.'s Level I PASARR screen. As part of the screen, Ms. Richer completed a form provided to Princeton by DOH titled "New Mexico PASRR

Screening Document"[2] (the PASARR Form). Ms. Richer relied on J.F.'s medical history, physical examination, and past admission orders in conducting her Level I PASARR screen of J.F. and in completing the PASARR Form.

{8}    Section A of the PASARR Form titled "Client Data" asks for general personal information about a nursing home applicant, including whether she or he has any physical or mental diagnoses. Ms. Richer stated that under Section A, J.F. suffered from spina bifida, dystonia, and urinary tract infection.

{9}    The heading for Section D of the PASARR Form states that "IF ANY ONE of the items to this section is 'Yes,' the person MUST BE REFERRED TO PASRR." Under Section D are Questions 4 and 5. Question 4 asks "[i]s there any indication of mental retardation?" Finding no indication of mental retardation in J.F.'s medical records, Ms. Richer checked "No" to question 4.

{10}    Question 5 asks "[i]s there any indication of developmental disability (a severe, chronic disability that manifested before age 22)?" The instructions on the PASARR Form addressing Question 5 state that "[a]ny severe, chronic disability (except mental illness) that occurred before age 22 may indicate a developmental disability.

---

[2]Although New Mexico uses the abbreviation "PASRR" in its nursing home preadmission screening regulations, procedures, and forms as opposed to "PASARR" as used in the federal statutory and regulatory framework, all references to the New Mexico framework hereinafter will use the abbreviation "PASARR" for purposes of consistency.

Examples include: cerebral palsy, spina bifida, quadriplegia before age 22, a seizure disorder that started before age 22 or a severe head injury that occurred before age 22." Concluding that Question 5 was aimed at screening for developmental disability "as it relates to mental retardation," and finding no indication in J.F.'s medical records of this form of disability, Ms. Richer checked "No" to Question 5.

{11}     Ms. Richer additionally found no indication in J.F.'s medical records of mental illness. Based on the lack of indication of either mental illness or mental retardation in his medical records, Ms. Richer did not refer J.F.'s Level I screen to DOH for a Level II evaluation. J.F. was admitted to Princeton and received nursing home care funded through Medicaid over the next two years.

{12}     On July 19, 2013, for reasons that are not clear in the record, another Level I PASARR screen was completed for J.F. by a staff member at the University of New Mexico Hospital (UNMH). The UNMH staff member indicated on the PASARR Form that she completed that J.F. had a diagnosis of spina bifida and was suspected of having mental illness. The UNMH staff member also checked "Yes" to Question 5. Based on this positive Level I screen, UNMH referred J.F.'s screen to DOH. After consulting with Princeton, however, UNMH submitted a revised Level I PASARR screen to DOH with all items, including Question 5, checked "No." DOH responded to UNMH by requesting that it submit a second revised Level I PASARR screen for

J.F. with Question 5 checked "Yes" based on J.F.'s diagnosis of spina bifida. UNMH therefore submitted a second revised Level I PASARR screen to DOH reflecting the requested change.

{13} Based on the information it received from UNMH, DOH conducted a Level II PASARR evaluation of J.F.'s condition and determined that J.F.'s needs met the criteria for nursing home level care and that no specialized services were warranted under the circumstances. DOH informed Princeton and J.F. of this determination on July 22 and 23, 2013, respectively.

{14} DOH also told Princeton on July 23, 2013, that in light of his spina bifida diagnosis, J.F.'s Level I screen should have been referred to DOH for a Level II evaluation when it was originally performed by Ms. Richer in June 2011. DOH contended that Princeton's preadmission screening of J.F. was incomplete and out of compliance with its PASARR regulations.

{15} DOH also communicated to HSD/MAD on the same day that Princeton had been out of compliance with its PASARR regulations between the date of J.F.'s admission to Princeton on June 28, 2011, and the date of the DOH's Level II PASARR determination on July 22, 2013. DOH concluded in its communication to HSD/MAD that Princeton should therefore be required to forfeit the FFP it received

7

to pay for J.F.'s care while it was out of compliance with HSD/MAD PASARR regulations.

{16} On May 13, 2014, HSD/MAD sent a notification of noncompliance to Princeton. The notification stated that Princeton had been out of compliance with 8.312.2.18(B), (C) NMAC for "failure to complete [the] PASRR process for [J.F.] for the dates of 06/28/2011 to 07/22/2013." Because "Failure of a Medicaid Certified Nursing Facility to follow the PASRR regulations requires loss of funding from admission until the PASRR process is complete," the notice stated that based on DOH "audit findings" HSD/MAD "has calculated an overpayment to Princeton Place in the amount of $158,178.25." As a result, the notice demanded that "Princeton Place must submit [to HSD/MAD] payment in full for the deficiencies identified," in the amount of $158,178.25.

{17} Princeton responded to HSD/MAD's notification of noncompliance. Princeton asserted that it had "timely and appropriately completed a pre-admission Level I PASRR screen [of J.F.] in accordance with federal requirements," and had concluded that J.F. "did not meet [the] criteria for a Level II PASRR screen during the time period . . . at issue[.]" Princeton therefore requested that HSD/MAD either "revise, rescind or otherwise withdraw its" notification of noncompliance or "provide Princeton Place with a hearing date at which it may present evidence and legal

8

arguments to challenge the recoupment identified" in the notification of noncompliance.

{18} A hearing before the HSD Fair Hearings Bureau was held to address Princeton's challenge to HSD/MAD's proposed Medicaid recoupment. Testifying at the hearing for HSD/MAD were the staff manager for the DOH PASARR Program, Leslie Swisher, and bureau chief for the HSD/MAD Program Policy and Integrity Bureau, Robert Stevens. Testifying for Princeton were Ms. Richer and forensic and clinical psychologist, Dr. Anne Rose. The Administrative Law Judge (ALJ), David Bruce Nava, found and concluded that, "[p]ursuant to NMAC 8.312.2.18, Princeton had a duty imposed by regulation to report [J.F.'s] condition to the DOH, and they breached this duty. HSD has suffered damages as a result, because they are required to reimburse the federal government for the federal portion of the funds paid out to Princeton for the time period that the proper screening procedures were not in place."

{19} ALJ Nava also denied Princeton's request for his recusal from the case, which stemmed from his disclosure to the parties that as an assistant general counsel to HSD, he may have been asked to proofread the boilerplate MPPA to which all Medicaid providers, including Princeton, are a party. ALJ Nava reasoned that he gave no legal advice to HSD/MAD concerning the drafting of the agreement, that he had

no personal stake in Princeton's case, and that the substance of HSD/MAD's boilerplate MPPA was not at issue in Princeton's case.

{20} Based on ALJ Nava's findings of fact and conclusions of law, the Director upheld HSD/MAD's proposed recoupment against Princeton. Princeton appealed the Director's decision to the district court, pursuant to NMSA 1978, Section 39-3-1.1(C) (1999) ("Unless standing is further limited by a specific statute, a person aggrieved by a[n agency's] final decision may appeal the decision to [the] district court by filing in district court a notice of appeal within thirty days of the date of filing of the final decision."), and Rule 1-074 NMRA (governing the procedure for administrative appeals to the district courts).

{21} Princeton argued before the district court that the Director erred in upholding HSD/MAD's proposed Medicaid recoupment on grounds that: (1) HSD/MAD failed to meet its burden of proving by a preponderance of the evidence that Princeton violated any State or federal PASARR regulation; (2) HSD/MAD's notification of noncompliance references "audit findings," but HSD/MAD never conducted an audit; and (3) ALJ Nava failed to recuse himself after disclosing a conflict of interest. The district court thereafter issued its Rule 1-074 decision affirming the Director's proposed Medicaid recoupment against Princeton. The district court reasoned that Princeton incorrectly performed the 2011 Level I PASARR screen of J.F., that ALJ

Nava was not required to recuse himself from the case where Princeton's MPPA was not at issue in the case, and that although no formal audit was conducted in the case, this fact did not require reversal where HSD/MAD received its information concerning the dates of Princeton's alleged noncompliance directly from DOH.

{22} Princeton moved for rehearing, arguing that the district court had overlooked or misapprehended its standard of review under Rule 1-074(R). Princeton also argued that the district court overlooked or misapprehended the definition of a "related condition" under the federal PASARR regulations. Disagreeing with Princeton that it overlooked or misapprehended anything in regard to the administrative standard of review or PASARR definitions and standards, the district court denied Princeton's motion for rehearing.

{23} Princeton filed a petition for a writ of certiorari with this Court to review the decision of the district court, which we granted. Pursuant to the order of the district court, HSD/MAD's proposed recoupment has been stayed during the pendency of Princeton's appeal.

**DISCUSSION**

{24} Princeton's central argument on appeal is that it completed the Level I PASARR screening of J.F. in compliance with all State and federal PASARR regulations. The amicus, New Mexico Health Care Association/New Mexico Center

for Assisted Living (the Amicus), also develops an additional and related argument that HSD/MAD "cannot enforce, as if it were a properly promulgated [r]ule, language contained only in instructions appended to" the PASARR Form. As a result, the Amicus submits that while HSD/MAD may enforce the substance of the New Mexico PASARR regulations, "it cannot treat as a violation of that [r]ule a failure to comply with [the] instructions that are merely appended to" the PASARR Form.

{25}     Princeton raises two additional corollary issues on appeal. First, that the district court erred in affirming the Director's determination that ALJ Nava was not required to recuse himself from Princeton's case under the circumstances. Second, that HSD/MAD failed to substantiate its claim that it conducted an audit in conjunction with its action for Medicaid recoupment from Princeton. However, because we conclude that the outcome of whether Princeton complied with all applicable PASARR regulations in its performance of J.F.'s preadmission screening is dispositive, our analysis is limited to discussion of this issue.

**A.     Standard of Review**

{26}     In reviewing an agency decision, this Court applies the same standard of review applicable to the district court under Rule 1-074(R), *Hyden v. N.M. Human Servs. Dep't*, 2000-NMCA-107, ¶ 3, 130 N.M. 19, 16 P.3d 444, "while at the same time determining whether the district court erred in the first appeal." *City of Albuquerque*

*v. AFSCME Council 18 ex rel. Puccini*, 2011-NMCA-021, ¶ 8, 149 N.M. 379, 249 P.3d 510 (internal quotation marks and citation omitted). Rule 1-074(R) provides that administrative decisions are reviewed to determine:

>  (1) whether the agency acted fraudulently, arbitrarily, or capriciously;
>  (2) whether based upon the whole record on appeal, the decision of the agency is not supported by substantial evidence;
>  (3) whether the action of the agency was outside the scope of authority of the agency; or
>  (4) whether the action of the agency was otherwise not in accordance with law.

*See also* § 39-3-1.1(D). Because Princeton challenges the Director's decision, Princeton bears the burden of establishing that the decision falls within one of the grounds for reversal. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 9, 120 N.M. 579, 904 P.2d 28.

**B.    Analysis**

{27}    Administrative decisions are not in accordance with the law "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Summers v. N.M. Water Quality Control Comm'n*, 2011-NMCA-097, ¶ 10, 150 N.M. 694, 265 P.3d 745 (alteration, internal quotation marks, and citation omitted). In determining whether an administrative decision is not in accordance with law, issues of statutory and regulatory interpretation are reviewed de novo using the same rules courts use to interpret statutes. *See Town of Taos v. Wisdom*, 2017-NMCA-066, ¶ 6, 403 P.3d 713;

*Perez v. N.M. Dep't of Workforce Sols.*, 2015-NMCA-008, ¶ 9, 345 P.3d 330. While the appellate courts will accord some deference to an agency's interpretation of law, this Court "may always substitute its interpretation of the law for that of the agency's because it is the function of the courts to interpret the law." *Perez*, 2015-NMCA-008, ¶ 9 (internal quotation marks and citation omitted); *see also Carter v. N.M. Human Servs. Dep't*, 2009-NMCA-063, ¶ 8, 146 N.M. 422, 211 P.3d 219.

{28}    We begin by addressing the issue raised by the Amicus concerning whether the PASARR Form and instructions constitute rules, such that the failure to follow them constitutes a violation of law. Pursuant to the New Mexico Administrative Procedures Act, "[p]rior to the adoption, amendment or repeal of any rule," an agency shall: (1) "publish notice of its proposed action in the manner specified by law, or . . . as will reasonably give public notice to interested persons"; (2) "notify any person specified by law, and, in addition, any person or group filing [a] written request," of the time and place of any public hearing on the matter, an adequate description of the substance of the proposed action, and of any additional matter required by law concerning the statutory authority of the proposed rule; and (3) "afford all interested persons reasonable opportunity to submit data, views or arguments orally or in writing and examine witnesses, unless otherwise provided by law." NMSA 1978, § 12-8-4(A)(1)-(3) (1969).

{29} Additionally, under the State Rules Act, in order to have any "efficacy, validity or enforceability," a rule must be submitted by the promulgating agency to the state records administrator for publication. *See Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 1979-NMSC-090, ¶ 42, 93 N.M. 546, 603 P.2d 285; *see also* NMSA 1978, § 12-8-5(A) (1969) ("Each agency shall file each rule, amendment or repeal thereof, adopted by it, including all [existing] rules . . . according to the State Rules Act[.]"); NMSA 1978, § 14-4-3(A), (B) (2017) ("Each agency promulgating any rule shall place the rule in the format and style required by rule of the state records administrator and shall deliver the rule to the state records administrator . . . [who] shall maintain a copy of the rule as a permanent record open to public inspection during office hours, on the website of the records center, published in a timely manner in the New Mexico register and compiled into the New Mexico Administrative Code.").

{30} Relying on the United States Supreme Court case *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 95-101 (1995), HSD/MAD argues that the PASARR Form and instructions were intended to "interpret" the existing New Mexico PASARR statutes and regulations and "designed to assist lay people who might have difficulty figuring out if a condition is 'closely related to intellectual disability[.]' " HSD/MAD therefore contends that the PASARR Form and instructions were not

15

required to be "subject[ed] to full-blown rule promulgation" in order to be effective. *See id.* at 99-100 (stating "[i]nterpretive rules" aimed at advising the public of an agency's construction of the statutes and regulations that it administers, which are consistent with existing federal regulations, "do not require notice and comment" pursuant to the federal Administrative Procedures Act).

{31} Assuming without deciding that *Shalala* applies in the context of administrative procedure and rulemaking in New Mexico, HSD/MAD overlooks that the United States Supreme Court in *Shalala* also held that interpretive rules not promulgated in accordance with the federal Administrative Procedures Act "do not have the force and effect of law and are not accorded that weight in the adjudicatory process[.]" *Id.* at 99. As a result, even under the case law cited by HSD/MAD, the interpretive rules contained in the PASARR Form and instructions do not have the force and effect of law and cannot serve as the basis for a HSD/MAD enforcement action. This conclusion is consistent with our Supreme Court's precedent in *Bokum Resources Corp.*, which held that rules not promulgated, pursuant to the New Mexico Administrative Procedures Act and State Rules Act lack "efficacy, validity or enforceability" as law. *See Bokum Res. Corp.*, 1979-NMSC-090, ¶ 42. It follows that because it is undisputed that the PASARR Form and instructions were not promulgated, pursuant to the New Mexico Administrative Procedures Act and State

16

Rules Act, errors in completing the PASARR Form that do not otherwise violate properly promulgated PASARR rules or statutes, as the Amicus contends, "cannot be deemed violations of law" and cannot serve as the basis for the proposed Medicaid recoupment action against Princeton. Therefore, insofar as the Director and district court's decisions upholding the proposed Medicaid recoupment from Princeton relied upon the finding that Ms. Richer incorrectly checked "No" to Question 5 on the PASARR Form, this determination was not a violation of law.

{32} However, even accepting HSD/MAD's claim that an incorrect answer to a question on the PASARR Form could serve as the basis for a regulatory violation and Medicaid recoupment action, Ms. Richer did not violate the law in her performance of J.F.'s 2011 Level I PASARR screening. Prefaced by the heading stating that if answered "Yes," an individual "must be referred" to DOH for Level II PASARR screening, Question 5 on the PASARR Form asks whether a nursing home applicant presents "any indication of developmental disability (a severe, chronic disability that manifested before age 22)?" The instructions to Question 5 further provide that "[a]ny severe, chronic disability (except mental illness) that occurred before age 22 *may* indicate a developmental disability. Examples include: cerebral palsy, *spina bifida*, quadriplegia before age 22, a seizure disorder that started before age 22 or a severe head injury that occurred before age 22." (Emphasis added.)

{33} Giving the word "may" in the instructions to Question 5 its ordinary meaning, the PASARR Form and instructions do not mandate a referral for Level II screening of all individuals with a diagnosis of spina bifida. *See Thriftway Mktg. Corp. v. State*, 1992-NMCA-092, ¶¶ 9-10, 114 N.M. 578, 844 P.2d 828 ("[A] fundamental rule of statutory construction states that in interpreting statutes, the words 'shall' and 'may' should not be used interchangeably but should be given their ordinary meaning."); *see also* NMSA 1978, § 12-2A-4(A)-(B) (1997) (stating that the word "shall" indicates a "duty, obligation, requirement or condition precedent[,]" while the word "may" expresses "a power, authority, privilege or right"). Rather, we think that it is clear that the instruction to Question 5 allows those performing Level I PASARR screening of nursing home applicants to consider whether an individual who presents with a "severe, chronic disability," like spina bifida, shows any indication of developmental disability. *Cf. Thriftway Mktg. Corp.*, 1992-NMCA-092, ¶ 10 (holding that the statute providing the director of the alcohol and gaming division "may" approve or disapprove the issuance or transfer liquor licenses under certain circumstances was intended to "invest the director with discretion as to whether to give final approval" for such issuances and transfers).

{34} In performing the Level I PASARR screening of J.F., Ms. Richer relied on J.F.'s medical history, physical examination, and past admission orders. Based on her

analysis of J.F.'s medical records, Ms. Richer found no indication of developmental disability "as it relates to mental retardation" despite his diagnosis of spina bifida. Ms. Richer additionally found no indication in J.F.'s medical records of mental illness. Without indication of either mental illness or mental retardation in his medical records, there can be no dispute that Ms. Richer correctly concluded that it was unnecessary to refer J.F. to DOH for Level II screening. Further, Ms. Richer's conclusion was consistent with and furthered the central objective of the NHRA and federal PASARR regulations of "prevent[ing] the placement of individuals with" mental illness or mental retardation "in a nursing facility unless their medical needs clearly indicate that they require the level of care provided by a nursing facility." 57 Fed. Reg. at 56,451. We therefore conclude that the Director and district court erred in determining that Princeton improperly performed or otherwise failed to complete J.F.'s 2011 PASARR screening in violation of the law.

{35} Although not essential to our conclusion, we find Princeton's argument that Question 5 on the PASARR Form and its instructions are inconsistent with federal PASARR regulations to be persuasive. Princeton argues, and we agree, that Question 5 and its instruction, which appear to be aimed at screening for "related condition[s]" to intellectual disability by asking if there is "any indication of developmental disability (a severe, chronic disability that manifested before age 22)[,]" omits an

19

essential element of the federal PASARR definition of a "related condition." In particular, Question 5 and its instruction fail to include the requirement under 42 C.F.R. § 435.1010 (2012) that to constitute a "related condition," a condition must "result[] in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and require[] treatment or services similar to those required for these persons." As a result, insofar as this element is not included in Question 5 or its instruction, the PASARR Form is inconsistent with federal law resulting in regulatory uncertainty in New Mexico and potential conflict with federal PASARR standards.

{36}    Finally, it is important to emphasize that this case arose not from HSD/MAD's discovery that a patient had been mistreated or wrongfully admitted to Princeton. In fact, there is no dispute that Princeton was a proper placement for J.F. and that while residing at Princeton, J.F. received proper treatment. Rather, this is a case that arises from a failure by the State, by and through DOH and HSD/MAD, to follow its own regulations. *See Narvaez v. N.M. Dep't of Workforce Sols.*, 2013-NMCA-079, ¶ 15, 306 P.3d 513 ("An administrative agency is bound by its own regulations."). As conceded by counsel for HSD/MAD at oral argument before the district court, the conflict presented in this case arises as a result of PASARR being overseen by DOH and the payment of Medicaid funds being overseen by HSD/MAD. "They aren't

yoked departments[,]" counsel explained, "and sometimes the right hand doesn't know what the left hand is doing." As a result, when a Medicaid claim is submitted to a HSD/MAD managed care organization from a Medicaid provider for a patient that is otherwise eligible for Medicaid, the managed care organization apparently may pay the claim without knowledge of whether DOH has gone through the PASARR process. And it is not until DOH eventually learns that a PASARR mistake has been made and reports it to HSD/MAD that HSD/MAD backtracks to determine whether an overpayment has been made.

**CONCLUSION**

{37}     The order of the district court upholding HSD/MAD's Medicaid recoupment action against Princeton is reversed. This matter is remanded to the district court for further action consistent with this opinion.

{38}     **IT IS SO ORDERED.**

_____
                                        **MICHAEL E. VIGIL, Judge**

**WE CONCUR:**


_____
**LINDA M. VANZI, Chief Judge**


_____
**M. MONICA ZAMORA, Judge**

21