# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMSC-005**

**Filing Date: November 15, 2021**

**No. S-1-SC-36995**

**PRINCETON PLACE,**

Petitioner-Respondent,

v.

**NEW MEXICO HUMAN SERVICES DEPARTMENT,
MEDICAL ASSISTANCE DIVISION,**

Respondent-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI
Sarah M. Singleton, District Judge**

Released for Publication February 22, 2022.

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Michelle A Hernandez
Tomas J. Garcia
Deana M. Bennett
Albuquerque, NM

for Petitioner-Respondent

New Mexico Human Services Department
John Robert Emery, Deputy General Counsel
Santa Fe, NM

for Respondent-Petitioner

Lorenz Law
Alice Tomlinson Lorenz
Albuquerque, NM

for Amici Curiae
New Mexico Health Care Association
New Mexico Center for Assisted Living

**OPINION**

**THOMSON, Justice**

**{1}** Federal and New Mexico regulations require the implementation of a preadmission screening and annual resident review program (PASARR)[1] to identify individuals with mental illness or intellectual disability applying to and residing in Medicaid-certified nursing facilities. *See* 42 C.F.R. § 483.128(a) (2020)[2] (noting the two levels of preadmission screenings); 8.312.2.18(B) NMAC[3] (specifying purposes of the PASARR screenings). The federal screening requirements were enacted to "ensure that individuals were not being placed in [nursing facilities] unnecessarily or without adequate supports." Medicaid Program; Preadmission Screening and Resident Review, 85 Fed. Reg. 9990, 9990 (Feb. 20, 2020). In this case, a young man diagnosed with spina bifida (Applicant) was screened for admission to the Princeton Place (Princeton) nursing facility pursuant to PASARR. *See* 8.312.2.7(J) NMAC (defining "[n]ursing facility"). We address whether Princeton's decision not to forward Applicant's Level I screening for a Level II screening despite his spina bifida diagnosis violates the PASARR regulations.

**{2}** The New Mexico Human Services Department (HSD) initiated a recoupment action against Princeton to recover the Medicaid funds Princeton received during the time it was allegedly out of compliance with PASARR screening regulations pertaining to Applicant. *See* 42 C.F.R. § 483.122(b) (2020) (providing that nursing facilities are not eligible to receive Medicaid funding for periods when they are out of compliance with PASARR requirements). The district court upheld the agency recoupment action. HSD now challenges the Court of Appeals reversal of the district court, arguing that (1) the Court of Appeals erred in holding that the New Mexico Department of Health (DOH) PASARR Level I screening form is unenforceable because it was not promulgated pursuant to the State Rules Act, NMSA 1978, §§ 14-4-1 to -11 (1967, as amended through 2017), and (2) the Court of Appeals erred in holding that an applicant must have an indication of mental illness *in addition* to a developmental disability in order to be suspected of having a "related condition" pursuant to 42 C.F.R. § 435.1010 (2020). *Princeton Place v. N.M. Hum. Servs. Dep't, Med. Assistance Div.*, 2018-NMCA-036, ¶ 35, 419 P.3d 194.

**{3}** We conclude that Princeton's argument regarding the enforceability of the DOH Level I screening form and instructions was not preserved for appellate review. Nonetheless, we consider the issue a matter of general public interest and proceed to decide that question on the merits. We first hold that the screening form and instructions

---

1The federal regulations use the acronym PASARR. New Mexico regulations use the acronym PASRR. Both acronyms refer to the same preadmission screening and annual resident review process required by the federal Medicaid program. To reduce possible confusion, and because the federal regulations are the root law, this opinion uses the acronym PASARR generally.

2The *Code of Federal Regulations* is updated annually. Although the screenings at issue occurred when prior versions of the federal regulations were applicable, this opinion cites the most recent version of the regulations when there is not significant difference between the two versions.

3Although the versions of 8.312.2.18 NMAC applicable to the June 2011 and July 2013 screenings in this case are 8.312.2.18 NMAC (6/18/2010) and 8.312.2.18 NMAC (10/15/2012), respectively, the specific provisions of the current version, 8.312.2.18 NMAC (8/1/2014), do not differ from those of either applicable version.

are interpretive agency guidance that does not require promulgation pursuant to the State Rules Act and that the Court of Appeals erred when it concluded that Princeton "incorrectly" answering the question in the form and failing to refer Applicant for a Level II screening was the basis for the HSD enforcement action. *See id.* ¶¶ 31-34. Next, we hold that the HSD interpretation of "related condition" under 42 C.F.R. § 435.1010 to include spina bifida, thus requiring a Level II screening in this case, is not arbitrary and capricious, is supported by substantial evidence, and is otherwise consistent with the law. Accordingly, we reverse.

## I.  BACKGROUND

**{4}**  Before delving into the facts of the case, a discussion of the purpose and procedures of the PASARR program is required.

## A.  PASARR Requirements

**{5}**  The purpose of the PASARR regulations "is to prevent the placement of individuals with [mental illness] or [intellectual disability[4]] in a nursing facility unless their medical needs clearly indicate that they require the level of care provided by a nursing facility." Medicare and Medicaid Programs; Preadmission Screening and Annual Resident Review, 57 Fed. Reg. 56450, 56451 (Nov. 30, 1992). To effectuate this purpose, each state receiving federal Medicaid funding must "operate a preadmission screening and annual resident review program" that complies with federal law. 42 C.F.R. § 483.104 (2020). The corresponding regulations, 42 C.F.R. §§ 483.100-483.138 (2020), govern a state's responsibility for preadmission screening and annual resident review of individuals with mental illness and intellectual disability as defined by federal law. *See* 42 C.F.R. § 483.102.

**{6}**  States with approved plans are eligible to receive Federal Financial Participation (FFP) reimbursement for the costs incurred by nursing facilities that provide services to Medicaid-eligible individuals. *See* 42 U.S.C. § 1396b (2018); 42 C.F.R. § 483.122(a). However, "[w]hen a preadmission screening has not been performed prior to admission or an annual review is not performed timely, in accordance with § 483.114(c), but either is performed at a later date, FFP is available only for services furnished after the screening or review has been performed." 42 C.F.R. § 483.122(b). As such, nursing facilities must conduct screenings consistent with PASARR regulations as a precondition to receiving Medicaid reimbursement from the state. *See* 42 C.F.R. § 483.122.

---

4The federal government has specifically updated its language to phase out the term *mental retardation* because it "has negative connotations, has become offensive to many people, and often results in misunderstandings about the nature of the disorder and those who have it." 78 Fed. Reg. 46499, 46499 (Aug. 1, 2013). Therefore, this opinion will instead use the term *intellectual disability* unless directly quoting statutory language.

**B.     Level I and Level II Screenings**

**{7}**     There are two levels of preadmission screenings under the PASARR regulations, an initial screening (Level I) and a more thorough secondary screening (Level II) that can be triggered depending on the results of the initial screening. 42 C.F.R. § 483.128(a). Level I screenings "must identify all individuals who are suspected of having [a mental illness] or [intellectual disability] as defined in § 483.102." 42 C.F.R. § 483.128(a); *see also* 8.312.2.18(B) NMAC (providing that in New Mexico, "[a nursing facility] performs the [L]evel I screen which identifies an eligible recipient or member resident who has a mental illness or an intellectual disability"). Individuals are "considered to have intellectual disability" under 42 C.F.R. § 483.102(b)(3) if their condition is "described in the American Association on Intellectual Disability's Manual on Classification in Intellectual Disability" or they are found to have a "*related condition*" defined as follows:

> *Persons with related conditions* means individuals who have a severe, chronic disability that meets all of the following conditions:
>
> (a) It is attributable to—
>
> (1) Cerebral palsy or epilepsy; or
>
> (2) Any other condition, other than mental illness, found to be closely related to Intellectual Disability because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons.
>
> (b) It is manifested before the person reaches age 22.
>
> (c) It is likely to continue indefinitely.
>
> (d) It results in substantial functional limitations in three or more of the following areas of major life activity:
>
> (1) Self-care.
>
> (2) Understanding and use of language.
>
> (3) Learning.
>
> (4) Mobility.
>
> (5) Self-direction.
>
> (6) Capacity for independent living.

42 C.F.R. § 435.1010.

**{8}** In order to assist nursing facilities with Level I screenings, the DOH provides a screening form and instructions that reflect PASARR regulatory requirements. At issue here is Question D-5 of the screening form in use at the time of Applicant's screening, which asks, "Is there any indication [in Applicant] of developmental disability[5] (a severe, chronic disability that manifested before age 22)?" The instructions accompanying the form provide the following guidance for answering Question D-5: "Any severe, chronic disability (except mental illness) that occurred before age 22 may indicate a developmental disability. Examples include: cerebral palsy, *spina bifida*, quadriplegia before age 22, a seizure disorder that started before age 22 or a severe head injury that occurred before age 22." (Emphasis added.) A "yes" answer to Question D-5 requires a Level II screening. *See* 8.312.2.18(B) NMAC ("When an eligible recipient or member resident is identified, the [nursing facility] refers him or her to the DOH [developmental disabilities support division] for a PAS[A]RR level II evaluation.").

**{9}** The function of a Level II screening is to evaluate and determine whether nursing facility services and specialized services are needed. *See* 42 C.F.R. § 483.128(a); 8.312.2.18(B) NMAC. According to federal and New Mexico regulations, this is a decision that must be made by the state mental health and intellectual disability authority. *See* 42 C.F.R. § 483.106(d); 8.312.2.18(B) NMAC. The regulations also make clear that a state mental health authority may not delegate its responsibility for evaluations and determinations to nursing facilities. 42. C.F.R. § 483.106(e)(iii). In determining the placement of applicants, "the evaluator must prioritize the physical and mental needs of the individual being evaluated, taking into account the severity of each condition." 42 C.F.R. § 483.132(b). In making this determination, the evaluator must rely on medical data, including "(1) Evaluation of physical status (for example, diagnoses, date of onset, medical history, and prognosis); (2) Evaluation of mental status (for example, diagnoses, date of onset, medical history, likelihood that the individual may be a danger to himself/herself or others); and (3) Functional assessment (activities of daily living)." 42 C.F.R. § 483.132(c). The Level II screening ultimately determines whether an applicant's "total needs are such that his or her needs can be met in an appropriate community setting" or if a different placement such as inpatient care is necessary. 8.312.2.18(C) NMAC; *see* 42 C.F.R. § 483.132(a).

## C.    The Level I Screenings Conducted in This Case

**{10}** In 2011, Vivian Richer, a licensed practical nurse and admissions coordinator for Princeton, conducted a Level I screening for Applicant, who was born with cervical spina bifida.[6] Reading from a physician's preadmission records, Ms. Richer testified that although Applicant was able to walk until the age of fifteen, he was bedridden and dependent on a wheelchair for mobility at the time of the Level I screening. He also

5Although not defined by the regulations, Leslie Swisher, the staff manager for the DOH PASARR Program, testified that "the term developmental disability is used as an umbrella term, which includes" the categories of "intellectual disability [and] related condition."

6Spina bifida is a medical condition that develops in utero when "the neural . . . tissue that becomes . . . the spinal cord and the brain doesn't form correctly," leading to damage to the spinal cord. This damage may cause a wide range of physical and intellectual disabilities. *See generally* CDC, *What is Spina Bifida?*, https://www.cdc.gov/ncbddd/spinabifida/facts.html (last visited Oct. 18, 2021).

required assistance with activities of daily living such as dressing, bathing, toileting, hygiene, and ambulation. He performed consistently well in school, attending the University of New Mexico as a political science major for several years. Ms. Richer asserted that Applicant's records did not indicate that he had an intellectual disability.

**{11}**   Ms. Richer performed the Level I screening using the DOH screening form and instructions. Despite identifying that Applicant was diagnosed with spina bifida prior to his twenty-second birthday, Ms. Richer answered "no" to Question D-5. Her justification was that "[t]here was nothing in the record that indicated that [he had an impairment of intellectual functioning similar to those of intellectually disabled persons]." Because she answered "no" to Question D-5, Applicant's screening was not forwarded to DOH for a Level II evaluation.

**{12}**   Two years later, after Applicant was treated at the University of New Mexico Hospital (UNMH), and before he was readmitted to Princeton, UNMH conducted an additional Level I screening. Like Princeton's Level I screening, UNMH also noted Applicant's diagnosis of spina bifida. However, unlike Princeton, UNM forwarded its Level I screening to DOH for a Level II screening. At this point, the HSD Medical Assistance Division (MAD) became aware of the discrepancy between Princeton's original Level I screening and the Level I screening conducted by UNMH and issued a memorandum notice of overpayment seeking recoupment for Medicaid reimbursements. MAD sought reimbursement for payments to Princeton received for care of Applicant to which it was not entitled because Princeton failed to comply with the PASARR regulations, which required it to initiate a Level II screening prior to Applicant's admission. Princeton disputed MAD's assertion that it was required to initiate a Level II screening based on Applicant's Level I screening and challenged the recoupment action through an administrative proceeding, attempting to prove it was entitled to the payments at issue. *See* 8.351.2.15 NMAC (allowing that "a provider can request a hearing" if it disagrees with a MAD action to recover overpayment").

## D.     Recoupment Action

**{13}**   The HSD Fair Hearings Bureau held a hearing on Princeton's opposition to the proposed recoupment. Robert Stevens, Bureau Chief of the Program, Policy, and Integrity Bureau with the MAD, and Leslie Swisher, staff manager for the DOH PASARR program, testified on behalf of HSD. Ms. Richer, as Princeton's admissions coordinator and Level I screener, and Dr. Anne Rose, a forensic and clinical psychologist, testified on behalf of Princeton.

**{14}**   At the hearing, Princeton defended its reasoning for not initiating a Level II screening. Ms. Richer stated that she is "very confident" in her ability to screen for intellectual disabilities and that she marked "no" to Question D-5 "[b]ecause according to the instructions any severe chronic disability that occurred before age 22 may indicate a developmental disability. But in this case the record did not show that it did." Both Ms. Richter and Dr. Rose testified that Applicant's medical record did not indicate that he had a developmental disability.

**{15}** HSD viewed the purpose of Level I screening more broadly, maintaining that, "[t]he preliminary screen is only for the purpose of identifying a suspected qualifying condition. If the screen indicates the potential existence of a qualifying condition, it is ultimately DOH's responsibility to confirm the fact, assess the severity of the condition and determine whether nursing facility placement is appropriate." DOH argued that a nursing facility conducting a Level I assessment "typically" does not determine whether a related condition is present or not. In DOH's view, as argued in closing by HSD, "spina bifida is clearly identified as a qualifying developmental disability in the PASARR instructions accompanying the Level I screen form, and meets the definition of 'related condition' set forth in 42 C.F.R. § 435.1010." At the conclusion of the hearing, the administrative law judge held that "Princeton had a duty imposed by regulation to report [Applicant]'s condition to the DOH, and they breached this duty." Based on the decision of the administrative law judge, the MAD Director upheld the proposed recoupment against Princeton.

### E.    Appeals

**{16}** Princeton appealed the decision of the MAD Director to the district court to decide whether it was "reasonable to interpret the regulations as requiring that a nursing facility perform and submit a Level I PAS[A]RR screening [to DOH] for an individual with spina bifida when there is no history of limited mental functioning." The district court concluded that, "Princeton Place has failed in its burden to show that [MAD's] interpretation of the regulations was without a rational basis." *See* Rule 1-074(R) NMRA. The district court further reasoned that because Princeton incorrectly answered "no" to Question D-5, "it follows that it was also incorrect not to send the screening to DOH." The HSD recoupment action was affirmed.

**{17}** Following an unsuccessful motion for rehearing, Princeton filed a Petition for writ of certiorari with the Court of Appeals. The Court of Appeals granted the writ and assigned the case to the general calendar. The New Mexico Health Care Association and New Mexico Center for Assisted Living (Amici) submitted an amicus brief in support of Princeton. The Amici reframed the argument: "What the case is actually about is an agency's attempt to elevate an instruction appended to a form to the status of a rule and to impose penalties for an alleged violation of a 'rule' when the instruction was never included in any properly promulgated regulation."

**{18}** The Court of Appeals agreed with the position advanced by the Amici and adopted by Princeton that the DOH PASARR form and instructions do not have the "force and effect of law and cannot serve as the basis for a HSD/MAD enforcement action." *Princeton Place*, 2018-NMCA-036, ¶ 31. In addition, the Court of Appeals concluded that the term "may" contained in the instructions for Question D-5 gave discretion to Level I screeners "to consider whether an individual who presents with a severe, chronic disability, like spina bifida, shows any indication of developmental disability." *Id.* ¶ 33 (internal quotation marks and citation omitted). The Court of Appeals reversed the district court and held that the administrative record demonstrated that Princeton complied with the applicable PASARR regulations. *Id.* ¶¶ 1, 34, 37. HSD appealed, and this Court granted certiorari "on all questions."

## II.    DISCUSSION

**{19}**    We first address the Court of Appeals conclusion that the DOH PASARR form and instructions did not have the force of law because neither were promulgated pursuant to the State Rules Act. Next, we address the HSD interpretation of the meaning of "related condition," pursuant to 42 C.F.R § 435.1010, which provided the basis for the recoupment action.

### A.    Whether the DOH Form and Instructions Are Agency Interpretive Guidance

**{20}**    The argument that the DOH PASARR form and instructions did not have the force of law and could not serve as the basis for the HSD recoupment action was raised for the first time to the Court of Appeals. While we conclude that it was not properly preserved and therefore not properly considered by the Court of Appeals, we nevertheless proceed to determine the merits of the controversy.

### 1.    The issue was not properly preserved, but the public interest requires that we consider the merits

**{21}**    The Rules of Appellate Procedure provide, "To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. "The preservation rule is intended to ensure that (1) the district court is timely alerted to claimed errors, (2) opposing parties have a fair opportunity to respond, and (3) a sufficient record is created for appellate review." *Progressive Cas. Ins. Co. v. Vigil*, 2018-NMSC-014, ¶ 31, 413 P.3d 850. This Court previously outlined a series of exceptions to the "general proscription against an appellate court considering matters not yet raised in the trial court." *St. Vincent Hosp. v. Salazar*, 1980-NMSC-124, ¶ 8, 95 N.M. 147, 619 P.2d 823. Some of these exceptions are now codified and include those matters that involve "(a) general public interest; (b) plain error; (c) fundamental error; or (d) fundamental rights of a party." Rule 12-321(B)(2).

**{22}**    The argument regarding the enforceability of the DOH form was not raised at the initial administrative hearing nor in the appeal to the district court. The enforceability of the form was first raised in the Court of Appeals, primarily by the Amici and briefly in Princeton's brief in chief, which stated that "failure to follow the State[] Rules Act in promulgating [the DOH] PAS[A]RR rules precludes any argument by [HSD] that Princeton Place's failure to adhere to those rules constitutes a violation of law." In an attempt to cure the preservation issue, the Amici continue to cite Princeton's statement of issues in the district court, which asserted that agency "actions were outside the scope of authority of the agency and not in accordance with law." However, Princeton's language cited by the Amici is too broad to serve Princeton as the basis for preservation. More importantly, despite their efforts, the "Amic[i] must take the case in this Court as it stands on appeal[] and . . . cannot assume the functions of a party." *Nall v. Baca*, 1980-NMSC-138, ¶ 10, 95 N.M. 783, 626 P.2d 1280. We therefore hold that Princeton did not preserve the issue for appellate review. *See Santa Fe Water Res. All., LLC v. D'Antonio*, 2016-NMCA-035, ¶ 8, 369 P.3d 12 (holding that an issue was not properly preserved when "the district court did not have an opportunity to rule on it").

**{23}** This Court may exercise its discretion to consider unpreserved issues when such consideration is justified by the existence of exceptional circumstances. *See State v. Harrison*, 2010-NMSC-038, ¶ 12, 140 N.M. 500, 238 P.3d 869 (electing to review an unpreserved error "because of the important public interest"). We conclude the general public interest exception requires our consideration of the merits. Although the general public interest exception "should be used sparingly," *State v. Pacheco*, 2007-NMSC-009, ¶ 11, 141 N.M. 340, 155 P.3d 745, we invoke it here in order to provide guidance on the interpretation of administrative agency materials that are not promulgated pursuant to the State Rules Act.

## 2. The DOH form and instructions were not the basis of the violation

**{24}** Princeton's argument on appeal that the DOH screening form and instructions have "no efficacy, validity or enforceability" unless adopted pursuant to the State Rules Act is an issue of law that we review de novo. *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 1979-NMSC-090, ¶ 42, 93 N.M. 546, 603 P.2d 285 (noting standards that are not properly promulgated under the State Rules Act "have no efficacy, validity or enforceability"); *see Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 12, 147 N.M. 157, 218 P.3d 75 (explaining that we review questions of law de novo).

**{25}** The Court of Appeals quotes the HSD response to the Amici in arguing that the DOH screening form and instructions "were intended to interpret the existing New Mexico PASARR statutes and regulations and designed to assist lay people who might have difficulty figuring out if a condition is closely related to intellectual disability," and thus the form and instructions "were not required to be subject[ed] to full-blown rule promulgation in order to be effective." *Princeton Place*, 2018-NMCA-036, ¶ 30 (alteration in original) (internal quotation marks omitted). HSD asserts here that the Court of Appeals erred in concluding that the district court decision was based on the enforceability of the DOH form, further asserting that recoupment was warranted "not because Princeton failed to properly fill out a form" but "because Princeton failed to forward for a Level II PAS[A]RR evaluation a person who met the criteria for a suspected related condition under the applicable federal regulations."

**{26}** The heart of the question is whether the DOH screening form and instructions are representative of agency interpretations of the applicable regulations or are independent agency actions requiring promulgation pursuant to the State Rules Act. Stated differently, we must determine whether the DOH form and instructions are interpretive rules or legislative rules. We examine whether the DOH form and instructions "have the force and effect of law" required for an enforcement action, guided by *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99-100 (1995), and *Bokum Resources Corp.*, 1979-NMSC-090, ¶ 42, which the Court of Appeals discussed. *See Princeton Place*, 2018-NMCA-036, ¶ 31. Although we agree with the Court of Appeals that this question turns on the application of *Shalala*, we reach a different conclusion.

**{27}** We are not aware of any New Mexico case law that discusses the distinction between an interpretive rule and a legislative rule that requires promulgation pursuant to

the State Rules Act. We therefore turn to federal administrative law for guidance. "[T]he [Administrative Procedures Act] provides that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b)(A) (2018)). In addition, "[t]he term 'interpretative rule,' or 'interpretive rule,' is not further defined by the [Administrative Procedures Act], and its precise meaning is the source of much scholarly and judicial debate." *Perez*, 575 U.S. at 96 (footnote omitted).

**{28}** Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala*, 514 U.S. at 99 (internal quotation marks and citation omitted). Interpretive rules do not require "notice-and-comment," which "makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules." *Perez*, 575 U.S. at 97. However, "that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* (internal quotation marks and citation omitted). In contrast, "rules issued through [an official] notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." *Id.* at 96 (internal quotation marks and citation omitted).

**{29}** "Interpretive rules do not require notice and comment, although . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala*, 514 U.S. at 99. However, *Shalala* also observes that official promulgation is required where the adopted materials are inconsistent with existing regulations. *Id.* at 100. ("[Administrative Procedures Act] rulemaking would still be required if [the regulatory guidance] adopted a new position inconsistent with any of the [agency]'s existing regulations."). This Court has previously recognized that concept within our own jurisprudence, holding that "an administrative agency has no power to create a rule or regulation that is not in harmony with its statutory authority." *Bd. of Cnty. Comm'rs of San Miguel Cnty. v. Risk Mgmt. Div.*, 1995-NMSC-046, ¶ 22, 120 N.M. 178, 899 P.2d 1132 (internal quotation marks and citation omitted).

**{30}** The United State Supreme Court reasoned that interpretive rules,

> while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) *superseded by statute on other grounds as stated in Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222 (5th Cir. 2017). Citing *Skidmore*, one commentator observed that, in general, "interpretative rules have value primarily as a means of communicating to the agency's staff and affected members of the public the agency's current views with respect to the proper

interpretation of its statutes and legislative rules." Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 Admin. L. Rev. 547, 552, n.44 (2000).

**{31}** Sufficient evidence supports the conclusion that Question D-5 represents a DOH interpretation of the related-condition requirement in 42 C.F.R § 435.1010. The district court concluded that Princeton's "no" answer to Question D-5 effected a violation of the PASARR regulations, stating, "Because the Court has already determined that Princeton Place incorrectly answered Question 5, it follows that it was also incorrect not to send the screening to DOH." The Court of Appeals agreed, noting, "Question 5 and its instruction . . . appear to be aimed at screening for 'related conditions' to intellectual disability by asking if there is 'any indication of developmental disability (a severe, chronic disability that manifested before age 22).'" *Princeton Place*, 2018-NMCA-036, ¶ 35 (brackets omitted). In its reply brief, HSD specifies that "[t]he relevance of the form is that it is the tool employed by DOH for use in performing Level I screens and informing DOH of cases where mental illness, intellectual disability, or a related condition is suspected, warranting a Level II evaluation." HSD further explains that the "[i]nstructions are also included on the form to assist the screener in determining if the applicant has a related condition."

**{32}** The DOH screening form and instructions do not contain new requirements of law but rather are representative of the DOH interpretation of existing PASARR regulations. *Cf. Shalala*, 514 U.S. at 100 (observing that a "rulemaking would . . . be required if [the regulatory guidance] adopted a new position inconsistent with . . . the [agency]'s existing regulations"). As such, they do not require official promulgation and also do not carry the full force of law. *See id.* at 99. As explained by HSD, the purpose of these materials is to assist a screener, who is not required to be a medical professional, to comply with PASARR regulations. We further determine that the purpose of the instructions for Question D-5 specifically is to advise the public and screeners regarding the agency's interpretation of the meaning of "related condition" pursuant to 42 C.F.R. § 435.1010. We agree with the Court of Appeals, when it determined that the DOH PASARR Level I screening form and instructions are interpretive rules, not legislative rules. *See Princeton Place*, 2018-NMCA-036, ¶¶ 30-31. However, as we discuss in the next section, the Court of Appeals erred when it determined Princeton's failure to initiate a Level II screening could not form a basis to a recoupment action. *See id.* ¶¶ 34, 37.

**B.      The Meaning of "Related Condition" Pursuant to 42 C.F.R. § 435.1010**

**{33}** We next address Princeton's challenge to the HSD interpretation of the meaning of "related condition" under 42 C.F.R. § 435.1010.

**1.      Standard of review**

**{34}** "When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Morningstar Water Users Ass'n v. N.M. Pub. Util.*

*Comm'n*, 1995-NMSC-062, ¶ 10, 120 N.M. 579, 904 P.2d 28. "The court will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Id.* ¶ 11 (internal quotation marks and citation omitted). Whether an administrative decision was in accordance with the law is a question of law, which we review de novo. *See Archuleta v. Santa Fe Police Dep't ex rel. City of Santa Fe*, 2005-NMSC-006, ¶ 18, 137 N.M. 161, 108 P.3d 1019.

**{35}** In reviewing an agency decision, a district court must consider

> (1) whether the agency acted fraudulently, arbitrarily, or capriciously;

> (2) whether based upon the whole record on appeal, the decision of the agency is not supported by substantial evidence;

> (3) whether the action of the agency was outside the scope of authority of the agency; or

> (4) whether the action of the agency was otherwise not in accordance with law.

Rule 1-074(R) NMRA. "On appeal, we review the decision of the [agency] under the same standard applicable in the district court." *In re Termination of Kibbe,* 2000-NMSC-006, ¶ 13, 128 N.M. 629, 996 P.2d 419. Ultimately, we will reverse the agency's ruling "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Archuleta*, 2005-NMSC-006, ¶ 18. "The party challenging [an administrative] decision bears the burden on appeal of showing that the decision is unreasonable, or unlawful." *Morningstar Water Users Ass'n*, 1995-NMSC-062, ¶ 9 (internal quotation marks and citation omitted).

**2. Whether the HSD interpretation of "related condition" pursuant to 42 C.F.R. § 435.1010 was reasonable**

**{36}** This case requires us to assess whether it was reasonable for HSD to interpret the definition of "*related condition*" pursuant to 42 C.F.R. § 435.1010 to include spina bifida and whether this provision grants discretion to the nursing facility conducting a Level I screening to decline to initiate a Level II screening in accordance with 42 C.F.R. § 483.128. HSD argues that a broad reading of the definition of related condition is consistent with the goal of a Level I screening "to cast as broad a net as possible." *See* 42 C.F.R. § 483.128(a) ("The [s]tate's PASARR program must identify all individuals who are *suspected* of having [mental illness or intellectual disability] as defined in § 483.102." (emphasis added)). Princeton opposes the "HSD[] per se, categorical rule that spina bifida always triggers a Level II screening, regardless of the individual's condition and needs." Princeton argues that to meet the definition of a related condition in 42 C.F.R. § 435.1010, the condition must "be closely related to Intellectual Disability," if the "severe, chronic condition . . . does not result in an impairment of general intellectual

functioning." Princeton further argues that a nursing facility has "the discretion to consider whether a particular chronic disability is nevertheless not a related condition."

**{37}** We begin with the language of 42 C.F.R. § 435.1010: "*Persons with related conditions* means individuals who have a severe, chronic disability that meets [four required] conditions." As to the first required condition, because neither "[c]erebral palsy [n]or epilepsy" is at issue here, the applicable chronic disability must be "attributable to . . . [a]ny other condition, other than mental illness, found to be *closely related* to Intellectual Disability because th[e] condition results in impairment of general intellectual functioning or adaptive behavior similar to that of [intellectually disabled] persons, and requires treatment or services similar to those required for these persons." 42 C.F.R. § 435.1010 (emphasis added). The second and third required conditions call for the severe, chronic disability to have "manifested before the person reaches age 22" and to be "likely to continue indefinitely." *Id.* The fourth required condition calls for "substantial functional limitations in three or more of the following areas of major life activity: (1) Self-care. (2) Understanding and use of language. (3) Learning. (4) Mobility. (5) Self-direction. (6) Capacity for independent living." *Id.*

**{38}** In New Mexico, individuals are determined to have an intellectual disability if they have: "(1) significantly subaverage general intellectual functioning and (2) deficits in adaptive behavior."[7] *State v. Trujillo*, 2009-NMSC-012, ¶ 10, 146 N.M. 14, 206 P.3d 125 (discussing the definition codified at NMSA 1978 § 31-9-1.6(E) (1999)). But 42 C.F.R. § 435.1010 recognizes that an applicant who is not intellectually disabled may nonetheless require care for a related condition under the second disability prong "attributable to . . . impairment of . . . adaptive behavior." Here, Applicant's severe, chronic disability "manifested before [Applicant] reache[d] age 22" and "is likely to continue indefinitely." 42 C.F.R. § 435.1010. Further, Applicant requires assistance with "[s]elf-care," a wheelchair for "[m]obility," and assistance with activities of daily living such that he lacks "[c]apacity for independent living." *Id.* Applicant therefore meets the definition of a person with a related condition.

**{39}** We defer to the HSD position that Level I screenings are meant to broadly screen for suspected intellectual disabilities. In light of this purpose and the fact raised multiple times throughout the proceedings that spina bifida may be linked to an intellectual disability, it was reasonable for HSD to interpret the 42 C.F.R. § 435.1010 definition of related condition to include spina bifida. The HSD interpretation is not arbitrary and capricious, is supported by substantial evidence, and is otherwise in accordance with the law. *See* Rule 1-074(R).

**{40}** We next consider whether Princeton had discretion to decide whether Applicant should receive a Level II screening because it determined that he did not meet the definition of a person with a related condition pursuant to 42 C.F.R. § 435.1010, despite

---

[7]Assessing "deficits in adaptive behavior" requires an assessor to "focus on [an individual's] *actual* everyday functioning." For example, "how an individual performed (or failed to perform) tasks in general society, rather than on whether he or she experiences functional limitations in the more regimented [institutional setting]." James W. Ellis et al., *Evaluating Intellectual Disability: Clinical Assessments in Atkins Cases*, 46 Hofstra L. Rev. 1305, 1332-35 (2018) (footnote omitted).

his spina bifida diagnosis. As HSD has pointed out, the regulations do not require a Level I screener to be a medical professional, and Level I screenings do not include an in-person evaluation. Level I screeners rely exclusively on medical records and documentation. Further, perhaps due to the financial incentive for nursing facilities to admit new residents, the regulations specifically forbid delegation to nursing facilities of placement determinations that occur at Level II screenings. *See* 42 C.F.R. § 483.106(e)(iii).

**{41}**    Having accepted that the purpose of the Level I screening is to broadly identify suspected intellectual disabilities, it is reasonable to interpret the PASARR regulations as prohibiting final determinations of whether an intellectual disability is present at Level I because the evaluation may be conducted by a layperson with limited access to medical data. Acceptance of Princeton's interpretation could allow for crucial medical decisions to be made before a comprehensive evaluation occurs, potentially jeopardizing applicants with nuanced or difficult-to-detect intellectual disabilities and resulting in inappropriate placements. The Court of Appeals erred in holding that Princeton did not violate the law by determining Applicant did not have an intellectual disability and declining to initiate a Level II screening. That determination is the sole province of the state mental health and intellectual disability authority. *See* 42 C.F.R. § 483.106(d).

## III.    CONCLUSION

**{42}**    Based on the foregoing, we reverse the Court of Appeals and hold that HSD may proceed with its recoupment action against Princeton to recover the Medicaid funding Princeton received during the time it was out of compliance with PASARR regulations.

**{43}    IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**NANCY J. FRANCHINI, Judge**
**Sitting by designation**